Tober Foreign Motors, Inc. & another[1] *vs.* Reiter Oldsmobile, Inc.

Suffolk. April 4, 1978. — September 7, 1978.

Present: Hennessey, C.J., Braucher, Kaplan, Wilkins, & Liacos, JJ.

*Constitutional Law*, Motor vehicle franchise, Commerce clause, Police power. *Due Process of Law*, Vagueness of statute. *Consumer Protection Act*, Motor vehicle franchise. *Motor Vehicle*, Dealer, Franchise.

General Laws c. 93B, enacted by St. 1970, § 814, § 1, regulating business practices among motor vehicle manufacturers, distributors and dealers, and particularly attacking "[u]nfair methods of competition and unfair or deceptive acts or practices," and making unlawful a considerable array of oppressive practices, falls within the Legislature's powers of economic regulation; provisions of the chapter aimed at unfair coercion of dealers by manufacturers or distributors are prima facie within the government's constitutional reach. [319–322]
In a civil action by an automobile manufacturer and a company to which it had recently granted a new dealership franchise against another company, which had long held a dealership franchise from the same manufacturer and was located in the same city as the new franchisee, seeking a declaration that certain provisions of G. L. c. 93B, as amended, regulating the granting by motor vehicle manufacturers of new dealership franchises which would compete with established franchises, were unconstitutional, the plaintiffs failed to show any burden on interstate commerce [322]; c. 93B aims at eliminating unfair or coercive industry practices and the protection of franchisees and the preservation of a sound competitive market [322–323]; and the statute contains no provisions hinting of any purposive effort by Massachusetts to burden sister States to its own advantage [323–326].
An argument that G. L. c. 93B, as amended, regulating business practices in the automotive industry, must be held void under the supremacy clause of the Federal Constitution as in conflict with Fed-

---

[1] General Motors Corporation.

eral law was without merit; the statute gives no existing franchisee of a dealership from an automobile manufacturer a veto power over the introduction of a potential competitor [326–328]; Federal antitrust law does not apply to restraints which emanate from State legislation, and c. 93B, a response to a matter of public concern, is administered by an official body [328–330].

General Laws c. 93B, § 4 (3) (*l*), a civil statute enacted in 1970, and providing that it shall be deemed an unfair method of competition for a motor vehicle manufacturer to grant a competitive franchise to a dealer in "the relevant market area" previously granted to another franchisee, such area to be determined "exclusively by equitable principles," and stating in brief form the criteria for allowing or denying a new franchise, was discussed by this court in connection with the amendment by St. 1977, c. 717, § 3, which defines "relevant market area," and was held not unconstitutional as depriving an automobile manufacturer and a grantee from it of a new dealership franchise of due process in that the provisions of the statute lacked adequate specificity. [330-332]

This court discussed constitutional objections to the arbitration provisions of G. L. c. 93B, § 4 (3) (*l*), which lacked any express provision for review of an arbitration decision respecting an "additional dealership" granted by an automobile manufacturer where there was an existing dealership, in the light of the amendment of that section by St. 1977, c. 717, § 3, which eliminated arbitration and vested jurisdiction with respect to a controversy over an "additional franchise" in the Superior Court. [332-334]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 2, 1976.

The case was reported by *Wilkins*, J.

*John J. Curtin, Jr. (Daniel L. Goldberg* with him) for General Motors Corporation.

*Robert L. Dambrov*, for Tober Foreign Motors, Inc., joined in a brief.

*Michael G. West* for Reiter Oldsmobile, Inc.

KAPLAN, J. In an action commenced in this court for Suffolk County on December 2, 1976, General Motors Corporation (GM), an automobile manufacturer, and Tober Foreign Motors, Inc. (Tober), a company located in the city of Springfield to which GM had recently granted a new dealership franchise, sought a declaration and ultimate injunctive relief against Reiter Oldsmobile, Inc.

(Reiter), a company which had long held a GM dealership franchise in the same city. The declaration sought was that certain provisions of G. L. c. 93B, as it then stood,[2] purporting to regulate the granting by motor vehicle manufacturers of new dealership franchises which would compete with established franchises in the same markets, were unconstitutional, with the result that Tober's franchise would be valid notwithstanding the fact that the statutory requirements were disregarded.

The case reaches us as reserved and reported by a single justice of this court on November 9, 1977, without decision, upon a statement of agreed facts. We are told that GM generally does not sell its products at retail; rather it uses independent dealers with whom, through its "divisions," it enters into "Dealer Sales and Service Agreements." Such an agreement—here an Oldsmobile agreement—has the effect of providing the dealer with the opportunity to secure a line of cars for resale at retail, and obligates him, among other things, to offer warranty and repair services to the purchasers. The Oldsmobile agreement places no restriction on whom the dealer may sell to, nor on the retail sales prices; and the dealer remains free to handle the automobiles of other manufacturers.

In the 1976 model years, GM shipped about 13,000 Oldsmobile cars, manufactured outside Massachusetts, to the fifty-nine franchised Oldsmobile dealers located in the Commonwealth. The defendant Reiter received 270 of these cars. From 1961 until 1976, Reiter had the only Oldsmobile franchise in Springfield; as of December 1, 1976, save for a dealer in Chicopee, Massachusetts, Reiter was the only Oldsmobile dealer in the "Springfield Multi-Dealer Area" consisting, besides Springfield, of thirteen surrounding cities and towns. (There were, however, Oldsmobile dealers in Westfield, Massachusetts, and En-

---

[2] General Laws c. 93B was enacted by St. 1970, c. 814, § 1, and had been amended through St. 1974, c. 619. For the amendatory legislation of 1977, see St. 1977, c. 717, § 4.

field, Connecticut, competing to some extent with Reiter; in the recent past, there were dealers in Wilbraham and Chicopee Falls, Massachusetts.)

In early 1976 it became known to Reiter that GM's Oldsmobile division contemplated the award of a new Springfield dealership, and on February 10, 1976, Reiter wrote to Oldsmobile to protest the plan. Nevertheless, on March 8, 1976, Oldsmobile sent a letter of intent to Tober's owners, which was accepted by them, embodying the purpose to award a dealership to Tober to be located in the city (Tober was then, and continues to be, a dealer in Datsun and Toyota cars at that location). Reiter brought suit promptly against Tober and GM in the Superior Court in Hampden County, seeking injunctive relief. That action has failed but does not preclude or affect the present.[3] On October 15 and November 9, 1976, Reiter sent telegrams to GM demanding arbitration under the provisions of G. L. c. 93B to be mentioned below. This drew the response on December 2, 1976, that GM considered the relevant part of the statute to be unconstitutional. On that day GM and Tober entered into an Oldsmobile Dealer Sales and Service Agreement. Also on that day they brought the present action for a declaration. Reiter answered and, in a counterclaim with three counts, sought injunctive relief, preliminary and final, together with damages. A single justice, after denying preliminary relief on the counterclaim and staying proceedings on two counts thereof pending resolution of the constitutional question, on joint motion of the parties severed the

---

[3] A temporary restraining order issued, but on October 13, 1976, Reiter's complaint was dismissed, a Superior Court judge explaining that the 1970 statute provided for injunctive relief only on the initiative of the Attorney General. Reiter applied to stay the judgment of dismissal and restore the temporary restraining order, but this relief was denied by the Superior Court and the Appeals Court. Reiter also filed a notice of appeal, but the record was not assembled within the required time. Mass. R. A. P. 9, 365 Mass. 851 (1974). Reiter moved for an extension of time, but the motion was denied by a single justice of the Appeals Court. An appeal of that decision to the full bench of that court is still pending.

counterclaim and transferred it to the Superior Court in Hampden County. On November 9, 1977, a single justice reported the case which, as limited, propounded the constitutional question.

The action attacked particularly § 3 (a) of G. L. c. 93B, taken in relation to § 4 (3) (l). Section 3 (a) declared "[u]nfair methods of competition and unfair or deceptive acts or practices, as defined in section four," to be unlawful, and provided that courts in construing § 3 (a) might be guided by interpretations of the Federal Trade Commission Act (15 U.S.C. § 45 [1976]). Section 4 stated that a number of acts or practices by manufacturers, distributors, dealers, or others, described in some detail, should be deemed violations of § 3 (a). These included, under § 4 (3) (l), the granting by a manufacturer of a competitive franchise in "the relevant market area previously granted to another franchisee," the relevant market area "to be determined exclusively by equitable principles"; with the proviso that if a manufacturer wished to grant such a competitive franchise, then it must give notice to the existing dealer or dealers in the area and, unless there was agreement, the matter should be submitted to "final and binding arbitration under the principles herein prescribed, for a determination of the relevant market area, the adequacy of the servicing of the area by the existing dealer or dealers and the propriety of the granting of such additional dealership." (The text of § 4 [3] [l] is reproduced in Appendix A.) The Attorney General was to enforce compliance with c. 93B in accordance with G. L. c. 93A, §§ 4-8;[4] a franchisee could claim up to treble damages as under c. 93A, §§ 9-10.[5]

[4] Those sections give the Attorney General investigative (including subpoena) powers concerning unfair trade practices; authorize him to seek injunctions of unfair trade practices after he has determined that judicial proceedings would be in the public interest; prescribe penalties for noncompliance with subpoenas or injunctions; and provide for withdrawing the right to do business from corporations in habitual violation of injunctions of their unfair trade practices.

[5] Chapter 93A authorizes the award of actual damages, or up to treble damages for a wilful or knowing use of an unfair method of competition or unfair or deceptive practice.

The parties' statement adds the following rather meager information about business results since the Oldsmobile franchise went to Tober. In the period January through July 10, 1977, sales of Oldsmobiles increased by 7% over the comparable 1976 period in the "Boston Zone" (which includes Massachusetts, New Hampshire, Vermont, Rhode Island, the northeastern half of Connecticut, and the northeastern portion of New York). Reiter's sales increased 13%, from 150 to 169 Oldsmobile cars. Tober also sold 169 Oldsmobiles. (The dealers in Westfield and Enfield, however, experienced declines of 20% and 5%: 178 to 143; 185 to 176.) In the nature of the case, we find no hard facts in this record as to the economic consequences of the particular feature of the legislation, were it to be enforced.

It remains to say that two days before this case was reserved and reported, on November 7, 1977, St. 1977, c. 717, was enacted (effective ninety days thereafter), revising sundry provisions of G. L. c. 93B. In the revision of § 4 (3), treating of illegal acts by manufacturers, subdivision (*l*) emerged as follows. It is an illegal act under § 3 (*a*) for a manufacturer "arbitrarily and without notice to existing franchisees" to grant a franchise to an additional franchisee who would conduct his dealership "from a place of business situated within the relevant market area of an existing franchisee or franchisees"; a manufacturer intending to make such a grant must give sixty days' prior notice to franchisees within a twenty-mile radius of the proposed new location; an existing franchisee may petition the Superior Court to determine whether the grant is arbitrary. "Relevant market area" is defined. Finally, the court, in determining whether the grant is arbitrary, shall consider "all pertinent circumstances"; these may include eight stated factors. (The text of § 4 [3] [*l*], as revised, appears in Appendix B.) In response to an illegal practice under c. 93B, the dealer may

begin his own action for equitable relief, but multiple damages are not available. G. L. c. 93B, §§ 12, 12A.

1. *Background and legitimacy, in general, of the statute.* The Legislature in 1967 enacted G. L. c. 93A which addressed itself to "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.,* § 2 (*a*).[6] This was essentially an act for the protection of consumers. In 1968 came a Report of the Legislative Research Council Relative to Regulation of the Automotive Industry (1968 Mass. Senate Doc. No. 983); and G. L. c. 93B, approved in 1970, followed with an attack particularly on "[u]nfair methods of competition and unfair or deceptive acts or practices" (*id.,* § 3 [*a*]) occurring in the automotive industry. The act covered transactions between dealers and the public, but dwelt especially on the relations among manufacturers, distributors, and dealers (which, however, must in the end also affect consumers). Here was a response to long-recognized problems including that of the coercion of dealers by automobile manufacturers through such means as the cutting off or purposeful manipulation of the supply of cars. See, in addition to the Report, *supra,* S. Rep. No. 1879, 84th Cong., 2d Sess., Bigness and Concentration of Economic Power—A Case Study of General Motors Corp., at 79; H.R. Rep. No. 2850, 84th Cong., 2d Sess.; House Doc. No. 468, 76th Cong., 1st Sess., FTC Report on Motor Vehicle Industry, at 1075; S. Macaulay, Law and the Balance of Power: The Automobile Manufacturers and their Dealers, 5-21, 48, 164-170, 176-177 (1966); Brown, A Bill of Rights for Auto Dealers, 12 B.C. Indus. & Com. L. Rev. 757 (1971). Congress had in fact provided a partial response to these problems with the 1956 Automobile Dealers' Day

---

[6] See the discussion of the background and structure of c. 93A in *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 693-697 (1975).

in Court Act, 15 U.S.C. §§ 1221-1225 (1976), which placed an obligation of good faith on manufacturers and invited supplementation in State legislation.[7]

Chapter 93B, § 4, makes illegal under § 3 (*a*) a considerable array of oppressive practices. Among those condemned are: requiring dealers to accept unwanted parts or accessories as a condition of securing the cars they request; implementing unfair plans for the allocation of cars among dealers; failing to deliver cars to dealers in reasonable quantities and at reasonable times; threatening cancellation of franchises; refusing without good cause to extend franchise agreements; discriminating in pricing among franchisees; except in special situations, operating manufacturer-owned retail outlets within the market areas of franchisees. Yet another technique with potentialities of unfairness is the granting of new franchises near established ones: having invested in his dealership, a dealer who has displeased the manufacturer, or who simply appears to be dispensable, finds his business turned into a losing venture overnight by the award of a new franchise around the corner, and, it may be, without any practical benefit to, or, indeed, with negative effects on, the buying public. In the attempt to regulate the granting of dealerships in territory already served, our statute in § 4 (3) (*l*) finds some echo in the legislation of a number of other States.[8]

---

[7] Section 1225, 15 U.S.C. (1976), states: "This chapter shall not invalidate any provision of the laws of any State except insofar as there is a direct conflict between an express provision of this chapter and an express provision of State law which can not be reconciled."

[8] See, e.g., Ariz. Rev. Stat. Ann. § 28-1304.02(0)(3) (1976); Col. Rev. Stat. Ann. § 12-6-120 (1)(h) (1973); Ga. Code Ann. § 84-6610(f)(8)(10) (Supp. 1977); Haw. Rev. Stat. § 437-28(b)(22)(B) (1976); Iowa Code Ann. § 322A.4 (Supp. 1978); Neb. Rev. Stat. § 60-1422 (1974); N.M. Stat. Ann. § 64-37-5(P) (Supp. 1975); N.C. Gen. Stat. § 20-305.5 (1975); R.I. Gen. Laws § 31-5.1-4(C)(11) (Supp. 1977); S.D. Codified Laws §§ 32-6A-3, 32-6A-4 (1976); Tenn. Code Ann. § 59-1714(20) (Supp. 1977); Vt. Stat. Ann. tit. 9, § 4074(c)(9) (Supp. 1977); Va. Code Ann. § 46.1-547(d) (Supp. 1977); W. Va. Code § 47-17-5(i) (Supp. 1978). See also Annot., 7 A.L.R. 3d 1173 (1966).

Chapter 93B as a whole is of a type falling within the Legislature's powers of economic regulation, and those provisions aimed at unfair coercion of dealers have evident justifications which bring them prima facie within the government's constitutional reach. Thus the Legislature might act for the express purpose of protecting dealers against what it could conceive to be the inequitable consequences of overweening economic power wielded by manufacturers—neither the Massachusetts nor Federal Constitution requires that a State let the chips fall where they may. So also the Legislature was not barred from acting on the belief that consumers would be hurt in the long run by tolerating the manufacturers' power to dictate the selling practices of their retail outlets: there has been complaint, for example, that dealers' servicing of cars has been affected by the manufacturers' arbitrary practices with respect to reimbursing franchisees for those costs. See Brown, A Bill of Rights for Auto Dealers, 12 B.C. Indus. & Com. L. Rev., *supra* at 762.

The decided cases in this and other courts, cited in the margin, are not encouraging of any attack on the validity of c. 93B or § 4 (3) (*l*) on the ground of a general lack of legislative authority,[9] and the plaintiffs are therefore re-

---

[9] Among our opinions upholding legislation regulating business, and often emphasizing the presumption of validity, see *M.H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n*, 371 Mass. 584 (1976) (maximum prices charged by wholesale liquor suppliers); *Opinion of the Justices*, 368 Mass. 857 (1975) (liquor wholesalers prohibited from holding retail licenses); *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 416-419 (1973) (policy of resale price maintenance a matter of economic theory and political judgment for the Legislature—though particular facet unconstitutional); *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401 (1972) (games of chance banned at gasoline filling stations); *Colella* v. *State Racing Comm'n*, 360 Mass. 152 (1971) (minimum jockey fees); *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686 (1971) (local rent control).

In the particular context of dealings between automobile manufacturers and dealers, other courts have upheld statutes protecting motor vehicle dealers from coercive manufacturer practices. See *E.L. Bowen*

mitted to the more specific points now to be considered.[10]

2. *Commerce clause contentions.* The parties take off in their arguments from the test of the validity of State legislation in relation to the commerce clause which is announced in *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970): "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." See, to the same effect, *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401, 412 (1972). There is no contention that the statute at bar lacks evenhandedness, which we take to mean nondiscrimination as between in-State and out-of-State businesses. But the plaintiffs urge that the law does not further any legitimate State interest and unreasonably burdens interstate commerce.

The statute aims at eliminating industry practices which may be reasonably thought to operate unfairly or coercively. It is designed to protect franchisees from having to succumb to dictation by manufacturers pressing their own interests in disregard of the health of other elements in the trade and perhaps ultimately of the welfare of the public. Section 4 (3) (*l*) is one of a set of provisions evidently directed to the time-honored State purpose of preserving a sound competitive market free of the

& Co. v. *American Motors Sales Corp.*, 153 F. Supp. 42, 47 (E.D. Va. 1957); *Willys Motors* v. *Northwest Kaiser-Willys*, 142 F. Supp. 469 (D. Minn. 1956); *Louisiana Motor Vehicle Comm'n* v. *Wheeling Frenchman*, 235 La. 331, 343 (1958); *Ford Motor Co.* v. *Pace*, 206 Tenn. 559, appeal dismissed, 364 U.S. 444 (1960); *Kuhl Motor Co.* v. *Ford Motor Co.*, 270 Wis. 488 (1955); *Forest Home Dodge, Inc.* v. *Karns*, 29 Wis. 2d 78, 85 (1965).

[10] We have not previously considered the constitutionality of any part of G. L. c. 93B. *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523 (1974), held that the chapter does not apply to franchise agreements antedating it, and in *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.*, 367 Mass. 464 (1975), we did not have to reach contentions of a conflict with Federal antitrust law.

domination of oligopolists at the top of a vertical chain of manufacture, distribution, and sale.

The plaintiffs appear not to deny the validity of these State interests or the purpose of the law to serve them, but simply assert that "[t]he protection afforded existing dealers from competition ... is not a legitimate state interest." But if the statute works sometimes to protect established dealers from new competition, this may be seen not as the object of the legislation, but as an incident in the pursuit of an ultimately procompetitive goal. (Of course we need not, and on the present record cannot, assess what progress the law actually makes toward that end.)

State laws legitimate in purpose may lay too great a burden on commerce, but in the present case there has been no showing of any such burden, let alone the "clearly excessive" burden mentioned in the *Pike* case.[11] The plaintiffs do not come near a demonstration that the statute will result in any lessening of the flow of automobiles into the Commonwealth, or in reduced sales here, or in an adverse influence on any other aspect of interstate economic activity.

We are referred, however, to two recent decisions of other courts holding State legislation resembling our statute invalid as unduly burdening commerce. *American Motors Sales Corp.* v. *Division of Motor Vehicles of Va.,* 445 F. Supp. 902 (E.D. Va. 1978). *General GMC Trucks,*

---

[11] In *Forest Home Dodge, Inc.* v. *Karns,* 29 Wis. 2d 78, 93 (1965), the State statute provided that manufacturers would be denied the privilege of operating dealerships in territories where present franchisees had complied with their contractual requirements of adequate representation. The court wrote: "While admittedly in this particular case the transactions between [an automobile dealer] and the manufacturer or distributor are transactions in interstate commerce, there is no evidence that there is a burden on interstate commerce or that the burden is 'undue.'" See also *Ford Motor Co.* v. *Pace,* 206 Tenn. 559, 571 (1960) (no commmmerce clause violation in statute permitting license to manufacture or distribute to be revoked for coercive practices including threats of franchise termination).

*Inc.* v. *General Motors Corp.*, 239 Ga. 373, cert. denied, 434
U.S. 996 (1977). These cases can be distinguished on the
ground that the laws seemed to make harm to existing
dealers the only relevant criterion for judging the pro-
priety of a new franchise, a feature giving an anticom-
petitive cast to the statutes.[12] By contrast the Massa-
chusetts provision contains no blanket rule but rather
calls for a multifactored analysis: in the 1977 version, for
example, one of the factors for analysis by the court is
"whether the establishment of an additional franchise
would increase competition and therefore be in the public
interest." G. L. c. 93B, § 4 (3) (*l*) (*viii*).

But we are obliged to say, further, that we do not accept
certain propositions adopted in the cited cases. Thus,
while "[t]he courts of Georgia . . . have traditionally limit-
ed the power of the State to regulate private business"
(239 Ga. at 376), implying some severe constraint, there
is no similar inhibition in the Commonwealth on legisla-
tion in this field directed to public ends. Nor do we accept
the view of the Federal court in Virginia that "the preser-
vation of competition is not a legitimate local purpose
under the Commerce Clause." 455 F. Supp. at 911.[13] As

---

[12] The Virginia statute would have banned a new dealership if the
Commissioner found after hearing that there was reasonable evidence
the market would not support all the dealerships in the particular
line-make. The Georgia law prohibited new dealerships in the absence
of a showing that existing dealers were not providing adequate repre-
sentation or that their business would not be reduced by the addition
of the new dealer.

[13] Although the court stressed that generality, perhaps it meant
only to espouse the more limited proposition that "[t]he State cannot
assert the purpose of preserving competition as appropriate justifica-
tion for denying [manufacturers] a new franchise in the location of
their choosing." "[Manufacturers] must be accorded free access to
every market in the Nation." 445 F. Supp. at 906-907.

Whatever merit such a view of the commerce clause may have in
light of the State's known powers of economic regulation, the Massa-
chusetts law comes into play only where there is already a franchise
in "the relevant market area," and therefore no manufacturer could
be excluded by the Massachusetts statute from any market.

already mentioned, Congress has in effect invited State measures to redress the imbalance of economic power between manufacturer and dealer (see note 7 *supra*).

We think these courts misunderstood *Buck* v. *Kuykendall*, 267 U.S. 307 (1925), and *H.P. Hood & Sons* v. *DuMond*, 336 U.S. 525 (1949), on which they rely, as do the present plaintiffs. The *Buck* case involved a common carrier which wished to operate between Seattle, Washington, and Portland, Oregon. A Washington statute forbade uncertified carriers from using the highways, and a certificate would not be issued for any "territory .. already being adequately served by the holder of a certificate." 267 U.S. at 313. Buck was refused certification on the ground that adequate transportation facilities between the two cities already existed. In the *American Motors Sales* case, *Buck* is used to support the proposition that a company may not be "prohibited from selling" (445 F. Supp. at 906) through a particular franchisee of its selection. We do not think the *Buck* case suggests so sweeping a limit on State power. Indeed, the *Buck* opinion explicitly rejected the notion that a State is without power, in furtherance of valid ends, to prohibit new competition. "The state statute is not objectionable because it is designed primarily to promote good service by excluding unnecessary competing carriers. That purpose also is within the State's police power." 267 U.S. at 315. The vice rather was that the challenged regulation of interstate carriers and highways constricted the physical channels of commerce; it focused on the "facilities for conducting interstate commerce," and in a way "not merely to burden but to obstruct" such commerce. 267 U.S. at 316. Unlike the Massachusetts statute which has no proved or obvious effect on the free flow of goods, the regulation in *Buck* was an obstacle to it. Thus it could not be said of the regulation that its "effects on interstate commerce [were] only incidental." *Pike*, 397 U.S. at 142. Compare *Raymond Motor Transp., Inc.* v. *Rice*, 434 U.S. 429 (1978), invalidating State regulations of the length and configu-

ration of trucks moving interstate: these barriers to the flow of interstate commerce (at 439-440) substantially retarded such traffic and increased its costs (at 445). But in *Exxon Corp.* v. *Governor of Md.*, 437 U.S. 117 (1978), the Court upheld a State law prohibiting oil producers from operating retail gasoline stations. It stressed that the commerce clause does not demand any particular market structure. It guards the "movement of goods in interstate commerce" (at 127)—and there had been no showing that the flow of petroleum products into the State would be lessened by the legislation.

Again, the *H.P. Hood* case is very different from ours. Hood bought and processed milk in New York for shipment to Massachusetts. Its license application for a new plant was denied because the New York commissioner anticipated that the result of further exports would be local milk shortages and higher prices in New York. 336 U.S. at 528-529. The Court held that a State could not thus cut off free trade for its particular advantage (at 533) and "isolate its own economy" (at 538). Similar issues were dealt with recently in *Philadelphia* v. *New Jersey,* 437 U.S. 617 (1978), where New Jersey was held forbidden by the commerce clause to promote its "economic isolation" (at 623-624) through stopping the importation of solid and liquid wastes. In the present case there is no hint of any purposive effort by Massachusetts to isolate its economy, to establish peculiar local prices, to reduce its imports, or otherwise to burden sister States to its own advantage. Nor would the *Hood* case control the present if some such condition were to occur fortuitously in the wake of our legislation.

3. *Antitrust contentions.* There is argument that the statute must be held void under the supremacy clause because it conflicts with Federal law. The plaintiffs are unclear as to the precise nature of the supposed conflict, but they claim that *American Motor Inns, Inc.* v. *Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975), presages the result. In that case a "per se" violation of § 1 of the Sher-

man Act (15 U.S.C. § 1 [1970]) was found in a program under which Holiday Inns allowed any one of the three established franchisees nearest an applicant to exercise an effective veto over the new franchise. The court wrote that "it is *per se* unlawful under section 1 of the Sherman Act for competitors who operate on the same level of the chain of distribution to agree among themselves on an allocation or division of markets. . . . By . . . permitting its existing franchisees to determine whether a potential competitor would be allowed to enter the Elizabeth-Newark market, [Holiday Inns] enabled its franchisees already in the Elizabeth-Newark area to divide that market between themselves, thus precluding further intrabrand competition." 521 F.2d at 1242.

The case is not in point. As the court indicates, arrangements for excluding sellers from a geographic market are per se violations when imposed by the fiat of the established sellers with whom the newcomer would compete on the same "horizontal" tier. Such a division of trade is held flatly to have no legitimate purpose. *United States* v. *Topco Assocs.*, 405 U.S. 596, 608 (1972). But where the exclusion is not thus concerted by the competitors themselves, a "rule of reason" is invoked and any anticompetitive effects are evaluated accordingly. See *United States* v. *Arnold, Schwinn & Co.*, 388 U.S. 365, 376 (1967); *White Motor Co.* v. *United States*, 372 U.S. 253, 263 (1965).[14] Cf. *Continental T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36 (1977).[15] The fineness of analysis of background and of putative market and industry results that may be re-

[14] A recent example is *Oreck Corp.* v. *Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) (en banc). Whirlpool dropped Oreck as a distributor of its vacuum cleaners, which left Sears Roebuck & Co. as its sole distributor in the United States and Canada. This was held a case for application of a rule of reason.

[15] The *Continental* case overruled *Schwinn* on another point, holding that certain vertically-imposed territorial restrictions on resale should be judged under a rule of reason, rather than a per se rule, as *Schwinn* had held.

quired in such cases is illustrated by *Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 329 (1961); *Chicago Bd. of Trade* v. *United States*, 246 U.S. 231, 238 (1918). Even if an element of agreement ("combination," to use Sherman Act terminology) can be found, a manufacturer's decision to sell only to certain dealers will probably be found legal "if competitive products are readily available to others," *United States* v. *Arnold, Schwinn & Co., supra* at 376, and a legitimate economic interest is served. For discussion of territorially exclusive distribution outlets coming about by means other than the say-so of the competitors, see 3 P. Areeda & D. Turner, Antitrust Law, par. 734d (1978).

In the present case no horizontally imposed restraint exists: unlike the situation in *Holiday Inns*, no existing franchisee is here given a veto power over the introduction of a potential competitor. Whether under the legislative program any dealer will ever enjoy the practical effects of exclusive franchise rights in a territory cannot be foretold. But if such protection is secured, it will only be after inquiry by a neutral body into the economics of the industry and market and the likely effect on competition of any decision concerning a new franchise.

Perhaps more fundamentally, the *Holiday Inns* analogy and the plaintiffs' antitrust contentions fail because Federal antitrust law does not apply to restraints that emanate from State legislation rather than from the actions of individuals. Our case falls under the doctrine of *Parker* v. *Brown*, 317 U.S. 341 (1943). There, a California statute had established a marketing plan for agricultural products. Where a State commission made findings after a hearing that restrictions of competition and controls of prices were needed to "prevent agricultural waste and conserve agricultural wealth of the state," a committee consisting largely of producers would draw up a specific program. This, after possible modification by the commission, would go into effect when approved by 65% of the relevant producers owning 51% of the "acreage devoted

to the regulated crop." 317 U.S. at 346-347. A dissatisifed grower sought to enjoin the marketing program for raisins. The Court assumed that the commerce power would enable Congress to preempt or occupy the field if it chose to do so expressly or impliedly, and the Court further assumed that the Sherman Act would invalidate the program if it came about "solely by virtue of a . . . combination . . . of private persons." *Id.* at 350. In the Court's view, however, Congress had not evinced an intention to occupy the field so as to "restrain state action" (at 351); rather the Sherman Act was intended "to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations." *Id.* While California could "not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful" (*id.*), the State could exercise "its legislative authority in making the regulation and in prescribing the conditions of its application." *Id.* at 352.

The *Parker* doctrine thus recognizes that State regulation of business must often involve an interference with free competition which would violate the antitrust laws if practiced by private parties. Because it is difficult to imagine that Congress meant the Sherman Act or other antitrust legislation to withdraw from the States their traditional regulatory powers (cf. note 7 *supra*), the market-shaping acts of State government must be immune from antitrust scrutiny. See generally 1 P. Areeda & D. Turner, Antitrust Law par. 212 (1978).[16]

Neither *Cantor* v. *Detroit Edison Co.*, 428 U.S. 579 (1976), nor *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773 (1975), cited by the plaintiffs, supports their claim that the "state action" immunity is inapplicable here. In both

---

[16] The authors say: "To have held the Sherman Act applicable to the states could have removed the authority of the states to create such traditional monopolies as common carriers, to regulate for the protection of the public, or to adopt other than a regime of competition even though peculiar local conditions required a different course which a busy national Congress was unlikely to consider." *Id.* at 69.

cases the Court rejected claims of antitrust exemption for programs initiated by private parties which did not effectuate any declared or identifiable State policy.[17] The challenge here, by contrast, is to a State law itself. That law represents a legislative response to a matter of public concern, and it is administered by an official body, not private parties (contrast *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U.S. 384 [1951]). Any involvement of franchisees in the working of the Massachusetts statute is certainly less vital than the role of the California growers in voting on a proposed control plan in *Parker* v. *Brown.* See also *Bates* v. *State Bar of Ariz.*, 433 U.S. 350 (1977) (exempts from antitrust review a ban on legal advertising adopted by the State Supreme Court). Cf. *Lafayette* v. *Louisiana Power & Light Co.*, 434 U.S. 811 (1978) (municipality operating power system not automatically within the exemption).[18]

4. *Particular due process contentions.* As the State's police power qualifies or modifies the private right to carry on a business as one wishes,[19] we need do no more

[17] In *Cantor* the Court rejected a private utility's claim that its free distribution of light bulbs was immunized from Sherman Act attack because the program had been sanctioned by the State Public Service Commission as part of the utility's rate structure and could not be changed under State law unless the Commission were to approve a new tariff. The plurality opinion noted that no State agency had ever specifically addressed itself to the desirability of the localized free light bulb program: "the State's policy is neutral on the question." 428 U.S. at 585. The program was that of a private company "and there [was] no claim that any state action violated the antitrust laws." *Id.* at 591. In *Goldfarb* v. *Virginia State Bar*, 421 U.S. 773 (1975), a county bar association set a minimum fee schedule in the exercise of rulemaking power delegated by the State bar association, which was a State instrumentality. The Court rejected a *Parker* v. *Brown* defense to the anticompetitive practice because it was not "required by the State acting as sovereign." *Id.* at 790. Compare *Bates* v. *State Bar of Ariz.*, 433 U.S. 350 (1977).

[18] For more ample discussion of the Supreme Court cases, see Mosk, J., in *Rice* v. *Alcoholic Beverages Control Bd.*, 21 Cal. 3d 431 (1978).

[19] See *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542-543 (1974) (and cases cited); *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401, 412-413 (1972).

in respect to any general due process contentions of a substantive character than to refer to point 1 above where we mention the grounds or reasoning on which the Legislature may be taken to have gone when it initiated c. 93B (enacted before any negotiation between the plaintiff companies).[20]

The plaintiffs claim a deprivation of due process in that the provisions of the statute impinging on them lack adequate specificity and so deprive them of due process (their claim of excessive "delegation" comes to the same thing). The 1970 statute did not carry a definition of "relevant market area," but the concept of a geographic market is a familiar one, explicated in Federal antitrust law (e.g., *United States* v. *Philadelphia Nat'l Bank*, 374 U.S. 321, 360-361 [1963]; *United States* v. *Connecticut Nat'l Bank*, 362 F. Supp. 240 [D.Conn. 1973], vacated and remanded, 418 U.S. 656 [1974]; see 2 P. Areeda & D. Turner, Antitrust Law, par. 524 [1978]), and the words take on further and clearer meaning when seen in relation to the purposes of the statute in which they are found and the conditions of the automotive industry known or subject to proof.[21] The 1977 revision sets out a quite sharp definition

----

[20] There is some intimation of an argument that the statute interferes with a right of the individual shareholders of the plaintiff Tober to pursue a common occupation. But, even if the individuals may be considered despite the corporate envelope, their careers as dealers are not being threatened merely because a question arises about adding an Oldsmobile line to the existing or other available lines. See *Wyeth* v. *Board of Health of Cambridge*, 200 Mass. 474, 478 (1909); *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923). See also the California litigation discussed at note 22 *infra*.

[21] "The standards for action to carry out a declared legislative policy may be found not only in the express provisions of a statute but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature." *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 544 (1965).

Many courts have upheld against vagueness arguments laws affording protection to automobile dealers which are at least as loosely

which may somewhat sacrifice theoretical correctness to ease of practical application. Again, the 1970 statute stated in brief form the criteria for allowing or denying a new franchise, but it would not require much imagination for the decisionmaker to read the language as encompassing more or less the factors later enumerated in the amendatory legislation of 1977. The words used in 1970 were no less informing than the reference to "unfair methods of competition," and so forth, contained in the Federal Trade Commission Act (15 U.S.C. § 45[a] [1] [1970]) and transported thence to our G. L. c. 93A, § 2(a), and G. L. c. 93B, § 3(a). See the discussion of the standard, as appearing in c. 93A, in *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595 (1975), and *Commonwealth* v. *DeCotis*, 366 Mass. 234, 242 (1974) ("The existence of unfair acts and practices must be determined from the circumstances of each case"). It is to be observed, finally, on the whole question of definiteness, that we have here, not a criminal statute punishing past conduct (cf. *Blenke Bros.* v. *Ford Motor Co.*, 203 F. Supp. 670, 672 [N.D. Ind. 1962]), but a civil statute which affords prior opportunity to resolve ambiguities of application.

It is suggested in the parties' statement that under the 1970 legislation a company granted a new franchise would be delayed in entering on it pending the conclusion

worded as ours. See *Volkswagen Interamericana* v. *Rohlsen*, 360 F.2d 437, 445 (1st Cir.), cert. denied, 385 U.S. 919 (1966); *Woodard* v. *General Motors Corp.*, 298 F.2d 121 (5th Cir.), cert. denied, 369 U.S. 887 (1962) ("good faith"); *General Motors Corp.* v. *Burns*, 316 F. Supp. 803, 807 (D. Haw. 1970); *Blenke Bros.* v. *Ford Motor Co.*, 203 F. Supp. 670 (N.D. Ind. 1962); *E. L. Bowen & Co.* v. *American Motor Sales Co.*, 153 F. Supp. 42, 46-47 (E.D. Va. 1957) ("regard to the equities"); *Borden Co.* v. *Thomason*, 353 S.W.2d 735, 754 (Mo. 1962) ("unfairly diverting trade"); *Ford Motor Co.* v. *Pace*, 206 Tenn. 559, 574-575, appeal dismissed, 364 U.S. 444 (1960); *Forest Home Dodge, Inc.* v. *Karns*, 29 Wis. 2d 78 (1965). But see *General Motors Corp.* v. *Blevins*, 144 F. Supp. 381, 395 (D. Colo. 1956) (in criminal statute, "without due regard to the equities" is too vague a standard).

of arbitration. This seems to base a contention that the Legislature may not treat a new franchise as presumptively illegal, that it must allow the manufacturer and new franchisee to carry on business activities as they desire until a due process hearing is held and a decision reached against them. But where is the interest on which to base the claim of procedural due process? It is hard to find a protected interest in contractual arrangements which run counter to preexisting State law that creates relevant conditions and restrictions. Assuming such an interest might be discerned, we doubt a company in Tober's position could succeed in the constitutional contention even if the 1970 legislation had to be read as necessarily keeping the company out of the franchise until the arbitration had run its course. A recent litigation in California, described in the margin, is instructive on this point.[22] The question approaches the academic, as Tober

---

[22] In *Orrin W. Fox Co.* v. *New Motor Vehicle Bd. of Cal.*, 440 F. Supp. 436 (C.D. Cal. 1977) (three-judge court), a California statute allowed any established franchisee to obtain an automatic injunction against a new dealership in the same line and geographic area, pending decision by a State board whether to authorize the new franchise. By the statute's operation, a new dealer was held off for fifteen months. The District Court held the statute unconstitutional and enjoined its enforcement, stating that the new dealer and the manufacturer could not be barred without prior hearing from enjoying the liberty of business dealings. Pending direct appeal to the Supreme Court of the United States, the injunction was stayed by a single Justice, who believed tht the full Court would note probable jurisdiction and a majority would probably reverse the judgment of the District Court. Mr. Justice Rehnquist wrote: "While it may well be that there remains a core area of liberty to engage in a gainful occupation that may not be 'arbitrarily' denied by the State, I do not think that the claim to establish an automobile dealership whenever and wherever one chooses is within that core area. . . .

"The cases upon which the District Court specifically relied in concluding that the California Act was unconstitutional . . . all . . . involved 'property' interests found to be protected under the Due Process Clause against deprivation without prior hearing. . . . But I cannot accept, and do not believe that a majority of this Court would accept, the proposition that respondents' 'liberty' interest in establishing a car dealership was also a 'property interest' which is protected against

has apparently worked its franchise from the time of award, and the revised legislation of 1977 puts the matter of staying the commencement of a new franchise, quite unexceptionably, in the hands of the court to be decided on equitable principles, and, indeed, with express provision against undue delay.

To revert yet again to the original legislation, there is objection that it did not make express provision for any review of the arbitration, but we are more confident than the plaintiffs that, in the statute governing commercial arbitration, or by analogy to it, might be found a basis for the usual narrow judicial review of the arbitral decision. No such problem exists under the 1977 law which eliminates arbitration and vests jurisdiction in the court with regular appellate review. Having spoken of the constitutionality of the pertinent provisions of the 1970 and 1977 laws to the extent the present record admits of such discussion, we forbear any opinion as to whether one or the other statute will apply to future proceedings in this case, if any should occur.

The case is remanded to the county court where an appropriate declaratory judgment will enter regarding the constitutional question reported.

*So ordered.*

APPENDIX A

*G. L. c. 93B, § 4(3)(l).*

"(3) It shall be deemed a violation of paragraph (*a*) of section three for a manufacturer, a distributor, a wholesaler, a distributor branch or division, a factory branch or division, or a wholesale branch or

---

deprivation without prior hearing in the same manner as were the property interests involved in *Fuentes* [v. *Shevin,* 407 U.S. 67 (1972)], *Sniadach* [v. *Family Fin. Corp. of Bay View,* 395 U.S. 337 (1969)], and *Mullane* [v. *Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950)]." *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.,* 434 U.S. 1345, 1348-1349 (1977).

division, or officer, agent or other representative thereof: . . .

"(*l*) to grant a competitive franchise in the relevant market area previously granted to another franchisee, such relevant market area to be determined exclusively by equitable principles; provided, however, that if the manufacturer wishes to grant such a franchise to an independent dealer or to grant an interest in a new dealership to an independent person in a bona fide relationship in which such person has made a significant investment subject to loss in such a dealership and can reasonably expect to acquire full ownership of the dealership on reasonable terms and conditions, then the manufacturer shall give notice to the existing dealer or dealers in the area and, unless the parties agree, the matter shall be submitted to final and binding arbitration under the principles herein prescribed, for a determination of the relevant market area, the adequacy of the servicing of the area by the existing dealer or dealers and the propriety of the granting of such additional dealership."

APPENDIX B

*G. L. c. 93B, § 4 (3) (l),* as amended through St. 1977, c. 717, § 3.

"(3) It shall be deemed a violation of paragraph (*a*) of section three for a manufacturer, a distributor, a wholesaler, a distributor branch or division, a factory branch or division, or a wholesale branch or division, or officer, agent or other representative thereof: . . .

"(*l*) arbitrarily and without notice to existing franchisees as hereinafter provided, to grant or enter into a franchise or selling agreement to or with an additional franchisee who intends or would be required by such franchise or selling agreement to conduct its dealership operations from a place of business situated within the relevant market area of an existing franchisee or franchisees representing the same line make, or whose specific area or areas of responsibility encompasses or includes all or a substantial portion of the relevant market area of such existing franchisee or franchisees regardless of whether such franchise or selling agreement delineates a specific area of responsibility or recites that the area of responsibility of such appointee is to be shared or operated in common with others.

"The appointment of a successor motor vehicle dealer at the same location as its predecessor or within a two-mile radius therefrom within one year from the date on which its predecessor ceased operations or was terminated, whichever occurred later, shall not be construed as a grant or the entering into of an additional franchise or selling agreement.

"Any manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division or wholesale branch or division which intends to grant or enter into an additional franchise or selling agreement, shall, at least sixty days prior to granting such franchise or entering into such agreement, give written notice of its intention

to do so to each motor vehicle dealer with a franchise or selling agreement covering the same line make within a twenty mile radius of the location where the business of the proposed franchise will be located. Such notice shall state the date on or after which such proposed franchise shall be granted or entered into.

"Prior to the date set forth in said notice on or after which such franchise or selling agreement will be granted or entered into, any motor vehicle dealer with a franchise or selling agreement covering the same line make as that offered to the proposed franchisee may, if such proposed franchisee intends to conduct or otherwise operate its business from any place or places within the relevant market area of such motor vehicle dealer or if the proposed franchise or selling agreement requires or specifies that the proposed franchisee conduct or otherwise operate its business from any place or places within the relevant market area of such motor vehicle dealer, petition the superior court to determine whether such appointment or proposed appointment is arbitrary; provided always, however, that such motor vehicle dealer first give written notice of its intention to do so to such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division or wholesale branch or division within thirty days from the date on which it received notice of such intention to grant or enter into the additional franchise or selling agreement. Such petition shall be entitled to a speedy trial. The court shall have authority to modify or stay the effective date of such proposed franchise or selling agreement or restrain its implementation pending a final determination of the issues raised by such petition upon such terms as it may determine. Any such modification or stay of the effective date of such proposed franchise or selling agreement or restraint on its implementation shall not be effective for more than thirty days unless extended by the court for good cause or unless the trial of such petition is then in progress.

"As used in this subsection, the relevant market area of a motor vehicle dealer with respect to any given line make is the more narrowly defined and circumscribed geographical area immediately surrounding its existing dealer location within which it obtained, during the period of time the dealership business has been operated from said location or the three-year period immediately preceding the date of said notice of intent to grant or enter into an additional franchise or selling agreement, whichever is the lesser, at least two-thirds of (*i*) its retail sales of new motor vehicles of said line make or (*ii*) its retail service sales, regardless of whether its franchise or selling agreement delineates or establishes a specific area of responsibility or whether, by custom or usage, a specific area of responsibility has been established or another motor vehicle dealer with a franchise or selling agreement covering the same line makes has a place of business in such market area.

"In determining whether such proposed appointment is arbitrary, the court shall consider all pertinent circumstances. These may include but are not limited to:

"(*i*) whether the establishment of such additional franchise appeared to be warranted by economic and marketing conditions including anticipated future changes;

"(*ii*) the retail sales and service business transacted by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee during the three year period immediately preceding such notice as compared to the business available to them;

"(*iii*) the investment necessarily made and obligations incurred by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee to perform their obligations under existing franchises or selling agreements;

"(*iv*) the permanency of the investment of the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee;

"(*v*) whether it is beneficial or injurious to the public welfare for an additional franchise to be established;

"(*vi*) whether the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee are providing adequate competition and convenient consumer care for the motor vehicles of the same line make owned or operated by residents and persons with places of business in the area to be served by the additional franchisee;

"(*vii*) whether the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the market area to be served by the additional franchisee have adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumer; and,

"(*viii*) whether the establishment of an additional franchise would increase competition and therefore be in the public interest.

"(*m*) to coerce a motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this chapter.

"(*n*) to resort to or use any false or misleading advertisement in connection with his business as such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof."