van Gestel, J.
This case is before the Court on the first phase of a bifurcated trial after remand from the Appeals Court. This phase is limited to determining the plaintiffs standing to sue by locating its relevant market area as defined by G.L.c. 93B, sec. 4(3)(1).
As background, the parties’ attention is drawn to Heritage Jeep-Eagle, Inc. v. Chrysler Corporation, 39 Mass.App.Ct. 254, 255-56 (1995). These findings and rulings will focus solely on the standing issue as affected by the relevant market area of Heritage Jeep-Eagle, Inc. (“Heritage”).
FINDINGS OF FACT
It has been accepted by the parties that prior to April 1, 1999, Heritage was a franchisee within the meaning of G.L.c. 93B, selling Chrysler, Plymouth, Jeep and Eagle vehicle lines, and operating its business from a location on Pleasant Street in Belmont, Massachusetts. It is further agreed that the defendant Lawless Chrysler-Plymouth Corporation (“Lawless”) is a franchisee within the meaning of the same statute, selling the same vehicle lines, and presently operating its business from a site on Lexington Street in Woburn, Massachusetts.
The Lawless dealership in Woburn is about 6 miles on a straight line from Heritage’s dealership in Belmont.
The time period in issue begins March 25, 1990— the date of the notice to Heritage from Chrysler Corporation of its approval of Lawless’s acquisition of Lynngate Motors of Lynn, Massachusetts — and ends three years later on March 25, 1993.
Heritage presented the testimony and analysis of Professor Paul D. Berger (“Berger”) to establish its relevant market area (“RMA”) during the time period in issue. Berger is a professor and the Department Chair in the Marketing Department at the Boston University School of Management. His testimony and analysis were credible and had sufficient scientific, statistical and logical bases to warrant their acceptance as reliable by the Court for the purposes of these findings.
In assessing Heritage’s RMA, Berger analyzed six separate groupings of repair/service invoices provided to him. Those groupings were as follows:
(a) The five categories of Cash, Warranty, Service K, Int. Prep, and Int. Sales;
(b) The four categories of Cash, Warranty, Service K and Int. Prep.;
*656 (c) The three categories of Cash, Warranty and Service K;
(d) The two categories of Cash and Warranty;
(e) The two categories of Cash and Service K; and
(f) The one category of Cash.
The various categories were selected by Heritage’s management personnel as representing each of the various kinds of repair/service invoices for the kinds of services performed at Heritage during the period in issue.
Berger then performed two sets.of analyses, one for each of two circular geographic areas. The first he designated as the “Lawless Circle.” This circle has the Heritage location in Belmont at its center and the Lawless location in Woburn on the circumference. The second Berger designated as the “two-thirds circle.” This latter circle represented the circle within which lie two-thirds of Heritage’s repair/service sales customers as reflected by addresses on its invoices, with the Heritage location again at the center of the circle.
Berger’s analysis of the Lawless Circle reflected that the percentages of Heritage’s repair/service transactions for customers located therein, during the period from March 25, 1990 to March 25, 1993, in the six groupings of invoices, ranged from 58% in group (a), in descending order, to 55% in group (f). These results established that the circular area containing two-thirds of Heritage’s repair/service customers must be larger than the Lawless Circle and, therefore, the Lawless location must be within the two-thirds circle.
The percentages of Berger’s groupings — 58% descending to 55% — are sufficiently below under the two-thirds — 67%—value to accommodate for any but the most gross errors or mistakes in assessing particular invoices.
Although Chrysler Corporation points to some mistakes in the invoices selected for the various categories, none suggested anything that would approach an outcome-determinative factor. This is. due to the gross numbers involved in each grouping of repair/service orders — ranging from approximately 18,000 down to 11,000. The percentage results for the various groupings do not change significantly by the addition or subtraction of relatively large numbers of invoices. Berger, by way of explanation, proffered the following example: “If you have 8,300 out of 15,000 in the circle, and then add 1,000 repair orders, all signifying Belmont (Heritages location) as the point of origin, you would then have 9,300 out of 16,000 in the circle. The increase in percentage, however, would be minimal - from 55.3% (8,300 of 15,000), to 58.1% (9,300 of 16,000).”
Berger’s establishment of the location of the two-thirds circle — the circle within which the statutory two-thirds of Heritage’s repair/service customers are located — all basically encompassed the same geographical area, regardless of which of the six groupings was considered. That geographical area extends, insofar as Woburn is concerned, at least 1.5 miles beyond the Lawless location on a straight line running away from the Heritage location in Belmont.
Berger also located a two-thirds circle for Heritage’s new car sales during the period in issue. That circle was considerably larger than the repair/service two-thirds circle, extending to over four miles beyond the Lawless location in Woburn. Notably, however, even this greater two-thirds circle for new car sales did not reach the borders of the City of Lynn, in which Lynngate Motors , was located prior to its acquisition by Lawless.
Chrysler challenges Berger’s work, and urges this Court to reject his expert opinions as scientifically unsound. The Court notes, however, that what Berger did was basically perform relatively rudimentary mathematical calculations. He was not so much rendering expert opinions as reporting on reliable calculations.
In theory, at least — although not as a practical matter of judicial economy — the Court itself could have reviewed each of the 11,000 to 18,000 invoices, accumulated the raw data and done its own mathematics.[1] This Court is quite comfortable in accepting Berger’s performance of those tasks and finds his results to be conclusive on the issue at hand. It is not even a close question whether Lawless falls within the geographical reach of the locus of two-thirds of Heritage’s repair/service customers. Lawless is in Heritage’s relevant market area as defined in G.L.c. 93B, sec. 4(3)(1).
RULINGS OF LAW
G.L.c. 93B, sec. 4(3)(1) makes it unlawful for a motor vehicle manufacturer to arbitrarily and without notice to existing franchisees grant a franchise to an additional franchisee who would conduct his dealership from a place of business situated within the relevant market area of an existing franchisee. Heritage Jeep-Eagle, Inc. v. Chrysler Corporation, 39 Mass.App.Ct. 254, 255 (1995). This statute, like those in 36 other states, is intended to protect franchisees from destructive intrabrand competition and the unequal economic power of automobile manufacturers. Id. at 259. See also Richard Lundgren, Incorporated v. American Honda Motor Co., 45 Mass.App.Ct. 410, 411 (1998). As such, the law ought to be liberally construed in a manner that achieves, rather than frustrates, its purpose. Here, the Court is dealing only with the preliminary issue of standing, not the ultimate determination of the merits of the claims.
In determining whether Heritage has standing to proceed with this case, it must show that Lawless is within its relevant market area as defined in G.L.c. 93B, sec. 4(3)(1). Lawless must be shown to be located within
*657 the more narrowly defined and circumscribed geographical area immediately surrounding its existing dealer location within which it obtained, during the period of the time the dealership business has been operated from said location or the three-year period immediately preceding the date of said notice of intent to grant or enter into a franchise or selling agreement, whichever is the lesser, at least two-thirds of (i) its retail sales of new motor vehicles of said line make or (ii) its retail service sales . . .
Here, the evidence clearly demonstrates that the lesser area is that of Heritage’s retail service sales, not its retail sales of new motor vehicles. In performing the RMA evaluation of retail service sales, Heritage need not be absolutely precise, but it must demonstrate that its method of calculation was reasonably accurate. The current definition of RMA has been said to be “quite sharp” and one “which may somewhat sacrifice theoretical correctness to ease of practical application.” Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 331-32 (1978).
The geometric shape of an RMA — whether a circle, a polygon or anything else — has yet to receive appellate interpretation in Massachusetts. This Court, however, finds Judge Wolfs analysis in American Honda Motor Co., Inc. v. Bernardi’s. Inc., C.A. No. 98-10690-MLW (D. Mass. 1999), to quite satisfactorily comport with the legislative intent and purpose behind the 1977 amendments to c. 93B, sec. 4(3)(1). To accept the Heritage RMA as a circle certainly creates a bright line test with ease of practical application, albeit while making some sacrifice in theoretical correctness.
ORDER
Based on the foregoing findings and rulings, the Court concludes that Lawless Chrysler-Plymouth Corporation was located in the relevant market area of Heritage Jeep-Eagle, Inc. during the period from March 25, 1990 to March 25, 1993. Thus, Heritage has established its standing to proceed with the next phase of this case.

 As a check on Berger’s percentage figures, the Court did do its own mathematical calculations to determine the percentage changes, for each of the six categories, if 2,900 invoices — a number urged by Chrysler Corporation to be in some way in error — were added to or deleted from the amounts used by Berger in each category. In each instance, although the percentages changed, the changes did not alter the fact that Lawless was within the Heritage RMA for repair/service customers.