NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11545

MASSACHUSETTS STATE AUTOMOBILE DEALERS ASSOCIATION, INC., &
others[1] vs.  TESLA MOTORS MA, INC., & another.[2]


Norfolk.     May 6, 2014. - September 15, 2014.

Present:  Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.


Motor Vehicle, Dealer.  Consumer Protection Act, Motor vehicle
    franchise, Standing.  Practice, Civil, Standing.



Civil action commenced in the Superior Court Department on
October 16, 2012.

A motion to dismiss was heard by Kenneth J. Fishman, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Thomas S. Vangel (James F. Radke with him) for
Massachusetts State Automobile Dealers Association, Inc., &
others.
    Richard P. Campbell for the defendants.
    John E. Kwoka, Jr., pro se, amicus curiae, submitted a
brief.

_____

[1] Connolly Buick, Co., Inc., doing business as Herb Connolly
Chevrolet; Jake Kaplan's Inc., doing business as Fisker Norwood;
and James G. Boyle.

[2] Tesla Motors, Inc.

BOTSFORD, J.  In Beard Motors, Inc. v. Toyota Motor Distribs., Inc., 395 Mass. 428 (1985) (Beard Motors), this court held that a Massachusetts motor vehicle dealer did not have standing to maintain an action for an alleged violation of G. L. c. 93B, § 12A, against a motor vehicle distributor with which it was not affiliated.  In the case before us, the principal question is whether amendments to the statute in 2002 broadened the scope of standing under c. 93B, such that Massachusetts motor vehicle dealers now have standing to maintain an action for an alleged violation of the statute against unaffiliated motor vehicle manufacturers or distributors.  We hold that the 2002 amendments did not have this effect.  Chapter 93B is aimed primarily at protecting motor vehicle dealers from injury caused by the unfair business practices of manufacturers and distributors with which they are associated, generally in a franchise relationship.  We therefore affirm the judgment of the Superior Court dismissing the plaintiffs' action on the basis of lack of standing.

Procedural background.  The plaintiff Massachusetts State Automobile Dealers Association, Inc. (MSADA), is a Statewide organization that represents the interests of new automobile and truck franchised dealerships in Massachusetts; two of the other plaintiffs, Connolly Buick Co., Inc., doing business as Herb

Connolly Chevrolet, and Jake Kaplan's Inc., doing business as Fisker Norwood, are Massachusetts motor vehicle dealers. The plaintiffs commenced this action against Tesla Motors, Inc., an automobile manufacturer, and its Massachusetts subsidiary, Tesla Motors MA, Inc., alleging that the defendants were operating "an automobile dealership showroom in the Natick Mall without a license and in violation of law which prohibits a manufacturer from owning a dealership."[3] The plaintiffs claimed that the defendants were in violation of G. L. c. 93B, §§ 3 (a)[4] and 4 (c) (10),[5] and were engaged in a civil conspiracy "to evade Massachusetts law and to operate an automobile dealership without the required licenses." They sought declaratory relief, a temporary restraining order, and preliminary and permanent injunctive relief that would, among other things, prevent the defendants from owning directly or indirectly any Tesla brand dealership in Massachusetts.

---

[3] We generally will refer to Tesla Motors, Inc., as "Tesla," and Tesla Motors MA, Inc., as "Tesla MA." Where appropriate, we refer to Tesla and Tesla MA collectively as "the defendants."

[4] General Laws c. 93B, § 3 (a), inserted by St.2002, c. 222, § 3, provides: "Unfair methods of competition and unfair or deceptive acts or practices, as defined in [c. 93B, §] 4, are hereby declared to be unlawful."

[5] General Laws c. 93B, § 4 (c) (10), inserted by St. 2002, c. 222, § 3, provides in part that it is deemed a violation of c. 93B, § 3 (a), for a manufacturer to own or operate, directly or through a subsidiary, a dealership in the Commonwealth "of the same line make" as any vehicles that the manufacturer manufactures or distributes.

The defendants moved to dismiss the complaint both for lack of standing and for failure to state a claim on which relief could be granted. See Mass. R. Civ. P. 12 (b) (1) and (6), 365 Mass. 754 (1974). They argued, among other things, that the plaintiffs lacked standing to claim a violation of G. L. c. 93B and conspiracy to violate c. 93B because they were not "affiliated dealers" of Tesla or Tesla MA. After a hearing, a judge in the Superior Court denied the plaintiffs' request for a temporary restraining order and preliminary injunction, ruling that the plaintiffs lacked standing to maintain the action. He subsequently denied the plaintiffs' motion for reconsideration and dismissed the complaint for lack of standing.[6,7] The plaintiffs appeal.

---

[6] The defendants also filed a special motion to dismiss pursuant to the so-called "anti-SLAPP" statute, G. L. c. 231, § 59H. The judge denied that motion. The defendants do not press the point on appeal.

[7] The judge ruled in part that the Massachusetts State Automobile Dealers Association (MSADA) did not have standing because it is not a manufacturer, distributor, or motor vehicle dealer entitled to bring suit under G. L. c. 93B, § 15. The plaintiffs claim on appeal that MSADA has "associational standing." See Modified Motorcycle Ass'n of Mass., Inc. v. Commonwealth, 60 Mass. App. Ct. 83, 85 & n.6 (2003), citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). Given the result we reach and, in any event, because of the presence of the two individual dealer plaintiffs, we need not attempt to resolve MSADA's associational standing claim.

Facts.[8]  Tesla is a manufacturer of electric motor vehicles.
It was incorporated in Delaware in 2003.  Tesla Motors MA is its
wholly-owned subsidiary, incorporated in Massachusetts in 2012
"to lease and operate stores, galleries and service centers for
the sale and service of Tesla vehicles in Massachusetts and to
provide the public with information about electric vehicle
ownership."  Neither of the defendants is affiliated in any way
with the plaintiffs.  The defendants are not members of MSADA,
and neither of the plaintiff individual dealers ever sold or
distributed Tesla brand vehicles.

At the time the complaint was filed, the defendants were
not licensed to sell motor vehicles in Massachusetts.  However,
Tesla MA had filed with the board of selectmen of Natick (board)
an application for a class 1 license pursuant to G. L. c. 140,
§§ 58 and 59.[9]  Tesla MA was also operating a "gallery" in the

---

[8] This recitation of facts is drawn from the allegations of
the plaintiffs' verified complaint and from affidavits and other
exhibits that were before the motion judge.  A judge ruling on a
motion to dismiss for lack of standing pursuant to Mass. R. Civ.
P. 12 (b) (1), 365 Mass. 754 (1974), may properly consider such
submissions.  See Ginther v. Commissioner of Ins., 427 Mass.
319, 322 & n.6 (1998); Watros v. Greater Lynn Mental Health &
Retardation Ass'n, 421 Mass. 106, 108-109 (1995).

[9] Class 1 licenses are granted to "[a]ny person who is a
recognized agent of a motor vehicle manufacturer or a seller of
motor vehicles made by such manufacturer whose authority to sell
the same is created by a written contract with such manufacturer
or with some person authorized in writing by such manufacturer
to enter into such contract, and whose principal business is the

Natick Mall at which interested individuals could view a Tesla display vehicle and learn about Tesla products and electric motor vehicles in general. The plaintiffs alleged in their complaint that the gallery was the functional equivalent of a dealership showroom, intended to generate sales of Tesla vehicles. The defendants have denied that any sales of vehicles have been made or facilitated at the gallery. In any event, between the time of the motion judge's ruling on the plaintiffs' request for a preliminary injunction and his ruling on the defendants' motion to dismiss, the board approved Tesla MA's license application and issued a class 1 license to Tesla MA, permitting it to operate a sales office located on West Central Street in Natick (town).[10]

---

sale of new motor vehicles." G. L. c. 140, § 58 (b). The licensing process is the subject of G. L. c. 140, § 59.

[10] MSADA and Brigham-Gill Motorcars, Inc., a Massachusetts motor vehicle dealer that is not involved in this litigation, challenged the issuance of the license to Tesla MA. They commenced an action in the Superior Court seeking declaratory relief pursuant to G. L. c. 231A, and relief in the nature of certiorari pursuant to G. L. c. 249, § 4, alleging that the license violated G. L. c. 93B, § 4 (c) (10). A different judge in the Superior Court allowed Tesla MA to intervene in that action and then dismissed the action on motion of Tesla MA and the board of selectmen of Natick. The judge ruled that the plaintiffs lacked standing to maintain the action because they had not demonstrated a legally cognizable injury, and because the statute governing the issuance of the license, G. L. c. 140, § 59, did not give them a right to challenge the granting of the license. The order dismissing the complaint in that action came after the order dismissing the complaint in this case, but

Statutory framework.  Chapter 93B was added to the General
Laws in 1970 (see St. 1970, c. 814, § 1).  It was, and continues
to be, "a comprehensive statute covering an array of business
practices in the automobile industry."  Beard Motors, 395 Mass.
at 430.  It "was enacted in recognition of the potentially
oppressive power of automobile manufacturers and distributors in
relation to their affiliated dealers."  Id. at 432.  "The
statute aims at eliminating industry practices which may be
reasonably thought to operate unfairly or coercively.  It is
designed to protect franchisees from having to succumb to
dictation by manufacturers pressing their own interests in
disregard of the health of other elements in the trade and
perhaps ultimately of the welfare of the public."  Tober Foreign
Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 322
(1978) (Tober).  See Brown, A Bill of Rights for Auto Dealers,
12 B.C. Indus. & Commercial L. Rev. 757 (1971) (Brown).

General Laws c. 93B, as enacted in 1970, remained in effect
and in the same general form through 2002.  Before the 2002
amendments, c. 93B, § 3 (a), declared unlawful the use of

_____

neither MSADA nor Brigham-Gill appealed the judgment of
dismissal.

Tesla and Tesla MA argue, as an alternative basis for
upholding the judgment of dismissal in this case, that the
plaintiffs are barred by principles of res judicata from
relitigating the issue of standing.  Given the result we reach,
we need not resolve that contention.

"unfair methods of competition and unfair or deceptive acts or practices, as defined in [c. 93B, §] 4." See G. L. c. 93B, § 3 (a), inserted by St. 1970, c. 814, § 1. Section 4 (3), in turn, itemized "a considerable array of oppressive practices," Tober, 376 Mass. at 320, by manufacturers and distributors that were deemed to be violations of § 3 (a). See G. L. c. 93B, § 4 (3) (a)-(m), inserted by St. 1970, c. 814, § 1, and as amended through St. 1977, c. 717, § 3. When originally enacted, this itemized list was described by one author as the "The Dealers' 'Bill of Rights' Provision," and was intended to protect franchised dealerships from specific types of abuses by their manufacturers. Brown, supra at 799-806. Chapter 93B also had a section authorizing the Attorney General, at the request of a dealer, manufacturer, or distributor, to enforce compliance with the chapter in accordance with G. L. c. 93A, §§ 4-8, inclusive, see c. 93B, § 12, as amended by St. 1977, c. 717, § 5, as well as a provision conferring a private right of action on motor vehicle dealers damaged by one or more of the proscribed acts or practices. See G. L. c. 93B, § 12A, as amended by St. 1985, c. 689, § 2.

The 2002 statutes repealed in its entirety the then-existing c. 93B and replaced it with a new c. 93B. See St. 2002, c. 222, § 3. However, many of the core provisions and the general structure of the previous statute have remained

essentially the same. Specifically, § 3 (a) of the new c. 93B[11] continues to declare unlawful the use of "[u]nfair methods of competition and unfair or deceptive acts and practices, as defined in [§] 4," and § 4 (c), like the former § 4 (3), consists of an itemized list of specific acts that are deemed to be violative of § 3 (a). Although the section number has changed, c. 93B continues to give the Attorney General the power to enforce compliance with the statute on request of any dealer, manufacturer, or distributor, see c. 93B, § 14, inserted by St. 2002, c. 222, § 3.

Of particular concern in this case are new § 4 (c) (10) and new § 15 (a). Under § 4 (c) (10), it is unlawful for a manufacturer, distributor, or franchisor representative "to own or operate, either directly or indirectly through any subsidiary, parent company or firm, a motor vehicle dealership located in the commonwealth of the same line make as any of the vehicles manufactured, assembled or distributed by the manufacturer or distributor." G. L. c. 93B, § 4 (c) (10), inserted by St. 2002, c. 222, § 3. Under the cognate provision of the version of the statute that existed just before its 2002 amendments, it was unlawful for a manufacturer, distributor, or wholesaler "to own and operate, either directly or indirectly

---

[11] The statute was amended by St. 2012, c. 152. Use of the words "new" or "now" in reference to G. L. c. 93B, means the statute inserted by St. 2002, c. 222, § 3.

through any subsidiary, parent or affiliated company or firm, a motor vehicle dealership within the relevant market area of a motor vehicle dealer of the same line make."  See G. L. c. 93B, § 4 (3) (k), as amended through St. 1977, c. 717, § 3.  Section 15 (a) creates a private right of action for dealers injured by statutory violations -- a right that formerly was set out in c. 93B, § 12A -- and adds a private right of action for manufacturers and distributors who may suffer injury on account of statutory violations by dealers.[12]

Discussion.  The plaintiffs urge us to read literally the language of G. L. c. 93B, §§ 4 (c) (10) and 15 (a), and to conclude that they have standing.  In particular, they argue that the plain language of § 15 (a) permits "[a]ny . . . motor vehicle dealer" who has been injured by "any act prohibited or declared unlawful under" c. 93B to maintain an action against

_____

[12]  Section 15 (a) provides in relevant part:

"Any manufacturer, distributor or motor vehicle dealer who suffers any loss of money or property, real or personal, as a result of the use or employment by a manufacturer, distributor or motor vehicle dealer of an unfair method of competition or an unfair or deceptive act or practice as defined by this chapter, any act prohibited or declared unlawful by this chapter, or any rule or regulation adopted under this chapter, may bring an action in the superior court, or if applicable in the federal district court for the district of Massachusetts, for damages and equitable relief, including injunctive relief . . . ."

G. L. c. 93B, § 15, inserted by St. 2002, c. 222, § 3.

the offending entity. Because they see the defendants' operation of a factory-owned store selling Tesla brand vehicles as a violation of § 4 (c) (10), and therefore an unlawful act within the meaning of § 3 (a), they assert that § 15 (a) gives them standing. The plaintiffs' position is that, given the unambiguous language of § 15 (a) and § 4 (c) (10), the motion judge erred in considering the history and purpose of c. 93B and this court's decision in the Beard Motors case to adopt a reading of the statute different from the one they advance. We do not agree.

First, although the parties do not address this point, it is not entirely clear that the plain language of § 4 (c) (10) applies to the defendants' conduct and renders it unlawful, as the plaintiffs contend. They maintain that § 4 (c) (10) prohibits a manufacturer such as Tesla, directly or through a subsidiary such as Tesla MA, from owning or operating in the Commonwealth "a motor vehicle dealership" selling its own line make of automobiles. "Motor vehicle dealership" is a term defined in c. 93B as:

> "any person who, in the ordinary course of its business, is engaged in the business of selling new motor vehicles to consumers or other end users pursuant to a franchise agreement and who has obtained a class 1 license pursuant to the provisions of [G. L. c. 140, §§ 58 & 59]" (emphasis added).

G. L. c. 93B, § 1, inserted by St. 2002, c. 222, § 3. Because neither Tesla nor Tesla MA is engaged in the business of selling new Tesla motor vehicles in Massachusetts "pursuant to a franchise agreement," there appears to be a question whether Tesla's business model involves the operation of a "motor vehicle dealership" within the meaning of c. 93B, § 4 (c) (10), and therefore whether, by its literal terms, the proscription of § 4 (c) (10) applies to the defendants at all.

Second, and more significantly, the plaintiffs take too narrow an approach to the task of interpreting the statutory provisions at issue. While the specific language of a statute is obviously key, "[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." Hanlon v. Rollins, 286 Mass. 444, 447 (1934). This is particularly true when a party's standing is the issue to be decided. Indeed, in the Beard Motors case, where the plaintiff's standing was precisely the question at hand, the

court rejected essentially the same approach to statutory interpretation as the plaintiffs here advance.[13]  We stated:

> "We have often recognized that not every party who can claim an injury as a result of violations of a statute or regulation has standing to bring an action thereunder. This is true even when a literal reading of the statute, without regard to the Legislature's purpose in enacting it, would appear to provide a broader grant of standing.  See, e.g., Gallo v. Division of Water Pollution Control, 374 Mass. 278, 283 (1978) (statute authorizing action by 'any . . . person interested'); Circle Lounge & Grille, Inc. v. Board of Appeal of Boston, 324 Mass. 427, 429 (1949) (statute authorizing action by 'any person aggrieved'); Monroe v. Cooper, 235 Mass. 33, 34-35 (1920) (same).  The scope of the grant of authority to bring an action for violation of G. L. c. 93B, § 12A [now § 15], must be

---

[13] In Beard Motors, Inc. v. Toyota Motor Distribs., Inc., 395 Mass. 428, 429 (1985) (Beard Motors), a franchised Chevrolet dealership (Beard) had entered into a contract with a franchised Toyota dealership (Bullock) to purchase the latter.  The agreement was conditioned on Bullock's obtaining consent to the assignment from the relevant Toyota distributor and the Toyota importer for the United States.  Id.  It suffices to say that consent was not forthcoming and the sale did not take place. Id.  Beard commenced an action against the distributor and the importer, claiming a violation of G. L. c. 93B, § 4 (3) (i), id. at 430, as then in effect, which required the written consent to the assignment of the manufacturer, distributor or wholesaler, "which consent shall not unreasonably be withheld" (emphasis added).  G. L. c. 93B, § 4 (3) (i), as amended through St. 1977, c. 717, § 3.  The sole issue in the case was whether Beard, never having been a Toyota dealer, had standing under G. L. c. 93B, § 12A (now § 15 [a]), to maintain an action against Toyota, claiming violation of a subsection of § 4 (3) (now § 4 [c]).  Beard Motors, 395 Mass. at 430.

The court examined the language, history, and purposes of the statute.  Despite the seemingly broad language of § 12A, which, like the present § 15 (a), on its face conferred standing on any motor vehicle dealer to maintain an action against a distributor alleging an unfair act or practice in violation of the statute, Beard did not have standing because its alleged injury was not within the statute's intended area of concern. Id. at 431-433.

determined with reference to the context and subject matter of the statute.  See Boston Edison Co. v. Boston Redevelopment Auth., 374 Mass. 37, 44 (1977); Ayer v. Commissioners on Height of Bldgs. in Boston, 242 Mass. 30, 33 (1922).  Whether Beard has standing under § 12A depends upon the intent of the Legislature.  To determine the intent of the Legislature, we look to both the language and purposes of the act.  Gallo v. Division of Water Pollution Control, supra at 284.

"Unless the Legislature has clearly indicated that it intends a broader grant of standing, see, e.g., Fournier v. Troianello, 332 Mass. 636, 639 (1955), we have generally looked to whether the party claiming to have standing has alleged an injury 'within the area of concern of the statute or regulatory scheme under which the injurious action has occurred.'  Penal Insts. Comm'r for Suffolk County v. Commissioner of Correction, 382 Mass. 527, 532 (1981), quoting Massachusetts Ass'n of Indep. Ins. Agents & Brokers v. Commissioner of Ins., 373 Mass. 290, 293 (1977). See also Circle Lounge & Grille, Inc. v. Board of Appeals of Boston, supra at 429-430 ('It was no part of the purpose of the zoning regulations to protect business from competition,' therefore, a person alleging injury due to increase in competition is not a 'person aggrieved' within the meaning of the statute).  An analysis of the provisions of G. L. c. 93B and of the Legislature's apparent objectives in enacting the statute leads to the conclusion that Beard has not alleged injury within the area of concern of the statute."

Beard Motors, 395 Mass. at 431-432.

The plaintiffs here attempt to distinguish the holding of

Beard Motors by focusing on its particular facts, arguing that

the court looked to the history and purpose of the statute to

avoid reaching an illogical result in the case.  We disagree.

Beard Motors and the cases cited in that case stand for the

well-settled proposition that, in matters of standing to

maintain actions for statutory violations, courts must look to

the history and purpose of the statute to determine its intended "area of concern."  The objective is not merely to avoid illogical results, but to respect the Legislature's intent by recognizing standing only for those whom the statute is intended to protect.[14]

The plaintiffs also maintain that, even if one were to take into account the history and purpose of the statute, they have standing to pursue their claim because theirs is a type of injury that the Legislature intended to be remedied by c. 93B. Their claimed injury is that they will be at a disadvantage competing with the defendants, who will be selling Tesla brand vehicles through company-owned stores and not through franchised dealerships.  They allege that "[u]nless the defendants are enjoined, they will be allowed to compete unfairly with the dealers as their model of manufacturer owned dealerships with remote service centers will allow Tesla and Tesla MA financial

---

[14] The plaintiffs claim to recognize that a determination of the statute's area of concern is critical, yet argue that the area of concern is to be determined (absent ambiguity or illogical results) solely from the language of the statute.  To the contrary, numerous cases of this court, addressing standing issues in a variety of contexts, have held that we find the intended area of concern, and hence the interests that the Legislature intended to protect, based on consideration not only of the language of a statute, but also on an examination of its history and purpose.  In addition to the cases cited in the passage from Beard Motors quoted in the text, see, e.g., HSBC Bank USA, N.A. v. Matt, 464 Mass. 193, 200 (2013), and cases cited; Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 135-136 (2000), and cases cited.

savings which would not be available to Massachusetts dealers who must spend considerably to conform to Massachusetts law. This could cause inequitable pricing which also [could] cause consumer confusion and the inability to fairly consider the various automobiles offered." Contrary to the plaintiffs' assertion, however, the type of competitive injury they describe between unaffiliated entities is not within the statute's area of concern. See American Honda Motor Co. v. Bernardi's, Inc., 432 Mass. 425, 436 (2000) (discussing "relevant market area" requirement of statute then in effect; "Chapter 93B was not intended to provide all dealers with a statutory right to seek protection from potential competition"); Tober, 376 Mass. at 322-323 (discussing statute's purpose as "preserving a sound competitive market free of the domination of oligopolists at the top of a vertical chain of manufacturer, distribution and sale. . . . But if the statute works sometimes to protect established dealers from new competition, this may be seen not as the object of the legislation, but as an incident in the pursuit of an ultimately procompetitive goal").

As previously discussed, the purpose of c. 93B historically was to protect motor vehicle dealers from a host of unfair acts and practices historically directed at them by their own brand manufacturers and distributors. The 2002 amendments did not change this goal. It is difficult, if not impossible, to view

the current version of c. 93B, § 4 (c), as representing anything

other than the same dominant thrust, i.e., to prevent abuses by

manufacturers of their franchisee dealers.[15]  The various

subsections of § 4 (c) other than § 4 (c) (10) all clearly

relate to relationships between manufacturers, distributors, and

franchise representatives, on the one hand, and their affiliated

dealers, on the other.  See G. L. c. 93B, § 4 (c) (1) (governing

allocation of new vehicles by manufacturers and distributors to

their dealers); § 4 (c) (2) (governing disclosure to dealers of

methodology by which such vehicles are allocated); § 4 (c) (3)

(governing delivery of vehicles from manufacturers and

distributors to their franchised dealers); § 4 (c) (4)

(proscribing threats to terminate franchise agreements);

§ 4 (c) (5) (prohibiting sales of same model vehicles to

different dealers at disparate prices); § 4 (c) (6) (prohibiting

---

[15] The plaintiffs suggest that the Beard Motors decision,
and our subsequent decision in American Honda Motor Co. v.
Bernardi's, Inc., 432 Mass. 425 (2000) (American Honda), are of
limited utility in determining the full extent of the protection
intended for dealers under G. L. c. 93B, because those cases
involved subsections of c. 93B, § 4, that applied on their face
only to affiliated parties.  We are not persuaded by this myopic
reading of the cases.  Beard Motors, in particular, spoke in
broad terms about the history and intent of the entire statute,
not just the specific subsection that was in play in that case.
Beard Motors, 395 Mass. at 430-433.  Beard, like the plaintiffs
in this case, maintained that it was injured by unlawful acts of
a party with whom it was not affiliated.  It was precisely
because the statute was intended to apply only to affiliated
parties that the court refused to recognize Beard's standing.
Id. at 432-433.

sales to individuals at price lower than price offered and charged to dealers); § 4 (c) (7) (prohibiting sales of parts and accessories to different dealers at disparate prices); § 4 (c) (8) (proscribing imposition of unreasonable restrictions on financial arrangement or structure of dealerships); § 4 (c) (9) (proscribing receipt of money, goods, or services from persons transacting with dealers, without accounting to dealers for same); § 4 (c) (11) (prohibiting coercion of dealers to release, assign, or waive prospectively their rights under chapter); § 4 (c) (12) (proscribing use of parent company, subsidiary, or agent to accomplish what would otherwise be prohibited conduct by manufacturer or distributor under chapter).  It would be anomalous to find, within this detailed list of rights and protections that are conferred on dealers vis-à-vis their manufacturers and distributors, a lone provision giving dealers protection against competition from an unaffiliated manufacturer.  Yet that is how the plaintiffs would have us construe § 4 (c) (10).  Absent a clear indication that the Legislature intended to have § 4 (c) (10) differ from § 4 (c) (1)-(9) and (11)-(12) in such a significant way, we are not persuaded by the plaintiffs' reading of § 4 (c) (10).

As the defendants suggest, the language of that subsection can more easily and naturally be understood as eliminating the "relevant market area" restriction that existed in c. 93B, § 4

(3) (k), as amended by St. 1977, c. 717, § 3, the antecedent version of § 4 (c) (10) that was in effect prior to the 2002 amendments.  Under § 4 (3) (k), a manufacturer was precluded (with limited exceptions not relevant here) from owning and operating "a motor vehicle dealership within the relevant market area of a motor vehicle dealer of the same line make."  Dealers were thus protected from having to compete with their affiliated manufacturers for sales within a defined geographical area.[16] The 2002 amendments broadened that protection:  § 4 (c) (10) precludes a manufacturer from competing for sales with an affiliated dealership by operating a dealership anywhere within the Commonwealth, not just within the defined "relevant market area" of one of its affiliated dealers.  G. L. c. 93B, § 4 (c) (10).

The legislative history relating specifically to the enactment of § 4 (c) (10) in 2002 supports our reading of this section.  The sole item of legislative history relied on by the plaintiffs is a "position paper" written by MSADA and presented to the Legislature's Joint Committee on Commerce and Labor in

---

[16] Determining "relevant market area," as defined in the statute, has proved to be quite challenging, and litigation concerning the relevant market area could be quite time-consuming and expensive.  See American Honda, 432 Mass. at 427-434; Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., 14 Mass. App. Ct. 396, 412 (1982) (observing that statutory definition of relevant market area "would perplex even the most percipient logician").

May, 2001, at the time the committee was considering an earlier version of amendments to c. 93B, 2001 Senate Doc. No. 87. The MSADA paper explained the key provisions of that bill and expressed the association's support for it. The paper stated that 2001 Senate Doc. No. 87 would eliminate two "loopholes" under c. 93B as then in effect,[17] by "explicitly prevent[ing] factory ownership or operation of new or used vehicle stores." Specifically, according to the paper, the Senate bill would "prohibit the direct sale of new cars to consumers by the factories."[18]

---

[17] MSADA's paper claimed that G. L. c. 93B as then in effect prohibited "manufacturers from directly owning and operating dealerships in Massachusetts." That is not correct. General Laws c. 93B, § 4 (3) (k), as amended by St. 1977, c. 717, § 3, only prohibited manufacturers from owning and operating a dealership "within the relevant market area of a motor vehicle dealer of the same line make."

[18] 2001 Senate Doc. No. 87, in relevant part, proposed the following language for the new G. L. c. 93B, § 4 (c) (10):

"(c) It shall be deemed a violation of subsection (a) of section 3 for a manufacturer, distributor, or franchisor representative: . . . (10) to own or operate, either directly or indirectly through any subsidiary or parent company or firm, a motor vehicle dealership located in the commonwealth of the same line make as any of the vehicles manufactured, assembled or distributed by the manufacturer or distributor. It shall also be a violation of subsection (a) of section 3 for a manufacturer, but not for a distributor, either directly or indirectly through any subsidiary or parent company or firm: (a) to obtain a class 1 or class 2 license issued pursuant to the provisions of [§] 58 or 59 of [c.] 140; or (b) to own or operate a business within the commonwealth for the purpose of selling motor vehicle parts or service directly to

However, 2001 Senate Doc. No. 87 was not the bill that ultimately was enacted. Rather, the bill that, a year later, the Legislature enacted and the then Acting Governor Jane Swift signed into law as St. 2002, c. 222, was 2002 Senate Doc. No. 2412.[19] This bill, and therefore the new G. L. c. 93B, § 4 (c) (10), that resulted from it, did not include the language from 2001 Senate Doc. No. 87 barring manufacturers from obtaining directly or through a subsidiary a class 1 license that is emphasized in note 18, supra. Accordingly, language that would have put into place (with certainty) the type of prohibition that the plaintiffs here seek to read into § 4 (c) (10) was not included in the statute as enacted.

Moreover, two other documents in Acting Governor Swift's papers concerning the passage of St. 2002, c. 222, indicate that the language in the proposed § 4 (c) (10) precluding a

---

customers; or (c) to enter into a contract with a business or third-party located in the commonwealth, which does not have and cannot obtain a class 1 license issued pursuant to the provisions of [§] 58 of [c.] 140, giving said business or third-party the right to provide warranty service to motor vehicles it manufactures, assembles or distributes" (emphasis added).

[19] The bill cited in the text, 2002 Senate Doc. No. 2412, itself was derived from 2002 House Doc. No. 4997. In all respects material to this case, the two bills are identical. Moreover, as indicated in the text, infra, after 2002 Senate Doc. No. 2412 was passed by both branches of the Legislature and sent to the acting Governor, the review conducted by the acting Governor's staff referred to the legislation as "House Doc. No. 4997."

manufacturer from owning or operating a motor vehicle dealership was intended and understood to apply only to manufacturers owning or operating dealerships in competition with their affiliated, own brand dealers. In particular, the acting Governor's papers include a paper prepared by MSADA in May, 2002, addressing the predecessor to 2002 Senate Doc. No. 2412, 2002 House Doc. No. 4997. See note 19, supra. This second paper, like the one written to address the Senate bill a year earlier, summarized the key provisions of 2002 House Doc. No. 4997 and expressed the association's support for it. Recognizing (at least implicitly) that the absolute ban on manufacturers obtaining class 1 licenses had by that time been eliminated from the proposed legislation, the association wrote in its 2002 paper that "House 4997 would create a statewide ban on factory ownership of dealerships to prevent manufacturers from directly competing with their own dealers by indirectly owning or operating dealerships in Massachusetts" (emphasis added). In other words, a manufacturer might obtain a class 1 license to sell vehicles, but under the new legislation it would not be able sell the same line make in Massachusetts if it already had an affiliated dealer within the Commonwealth.

The second relevant paper in the acting Governor's file is a memorandum to her from her deputy chief legal counsel in August, 2002, when 2002 Senate Doc. No. 2412 was before her for

signature. The memorandum states that "[t]he purpose of this law is apparently to protect dealers in their relationships with manufacturers, given the imbalance of bargaining power between the two." Further, in an apparent reference to § 4 (c) (10), the memorandum states that "dealers wanted to clarify that manufacturers should not be able to operate as dealers too (and thereby compete with their own franchisees)" (emphasis added); the memorandum also indicates that the bill's language was in response to dealers' complaints "that manufacturers can compete unfairly with their own franchisees by owning their own dealerships" (emphasis added). Finally, the memorandum assures the acting Governor that the amendments to G. L. c. 93B included in the proposed legislation were negotiated at length to the satisfaction of all concerned -- manufacturers, dealers, and consumer interests.

We take from these additional materials in the acting Governor's file that St. 2002, c. 222, was intended and understood only to prohibit manufacturer-owned dealerships when, unlike Tesla, the manufacturer already had an affiliated dealer or dealers in Massachusetts.

Conclusion. With a proper understanding of the language, history, and purpose of the statute in mind, we hold that G. L. c. 93B, § 15, does not confer standing on a motor vehicle dealer to maintain an action for violation of G. L. c. 93B, § 4 (c)

(10), against a manufacturer with which the dealer is not affiliated.  We therefore affirm the Superior Court's judgment dismissing the plaintiffs' action for lack of standing.

<u>So ordered</u>.