# United States Court of Appeals
## For the First Circuit

No. 23-1801

COLONY PLACE SOUTH, INC., d/b/a Volvo Cars Plymouth, and
25 FALMOUTH ROAD, INC., d/b/a Volvo Cars Cape Cod,

Plaintiffs, Appellants,

v.

VOLVO CAR USA, LLC; FIDELITY WARRANTY SERVICES, INC.; and VOLVO
CAR FINANCIAL SERVICES U.S., LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Gelpí, Montecalvo, and Rikelman,
Circuit Judges.

Jason T. Allen, with whom William Kirby Bissell and Bass Sox
Mercer were on brief, for appellants.

Michael Rayfield, with whom Stephen Hansen and Shook, Hardy
& Bacon were on brief, for appellees.

November 21, 2024

**MONTECALVO, Circuit Judge**.  Plaintiffs-appellants Colony Place South, Inc. and 25 Falmouth Road, Inc. (the "dealers") are two Massachusetts-based Volvo dealers.  They initiated this suit against defendants-appellees Volvo Car USA, LLC ("Volvo USA"); Volvo Car Financial Services U.S., LLC ("Volvo Financial"); and Fidelity Warranty Services, Inc. ("Fidelity") for allegedly violating various provisions of Massachusetts General Laws Chapter 93B ("Chapter 93B").  The alleged violations relate to Volvo-branded Prepaid Maintenance Program contracts ("PPMs") -- a financial product allowing customers to pay up front at a discounted rate for future, routine maintenance services like oil changes at Volvo dealerships -- that Fidelity administers and issues to Volvo dealers, who in turn sell the PPM contracts to their customers.  The parties cross-moved for summary judgment. After hearing argument on the cross-motions, the district court granted the defendants-appellees' motion and denied the plaintiffs-appellants' motion, concluding that entities like Fidelity are not regulated by Chapter 93B's relevant provisions. The dealers appeal that decision.  We affirm, for a different reason: the dealers' sale and service of the Volvo PPM are not franchise obligations under Chapter 93B.

# I.    Background

## A.    Factual Background

### 1.    The Parties

Defendant-appellee Volvo USA distributes and oversees the sale of Volvo cars in the United States through franchise agreements with dealerships. Volvo USA's franchise agreements set forth standard terms that are the same for both dealers; the dealers contend that these standard terms are uniform for Volvo dealers throughout the United States.

Volvo USA's indirect corporate parent, Volvo Car Corporation, is also the direct corporate parent of defendant-appellee Volvo Financial. Volvo Financial offers various finance and insurance products to Volvo dealers.

Defendant-appellee Fidelity, which is not a corporate affiliate of Volvo USA or Volvo Financial, develops, offers, and administers automotive financing and insurance products.[1] Fidelity sells its financing and insurance products through franchise dealers, who operate as middlemen; it does not sell any of these products directly to consumers. To design and sell such products, Fidelity partners with many companies, including Volvo, Kia,

---

[1] Fidelity is a wholly owned subsidiary of JM Family Enterprises, Inc., which is a corporate affiliate of Jim Moran & Associates, Inc. ("JM&A"). In this litigation, the parties use the names "Fidelity" and "JM&A" interchangeably. For the sake of consistency, we will refer to both entities as "Fidelity."

Toyota, Polestar, and J.D. Power.  Some of Fidelity's products are sold to customers "branded" with the name of a vehicle manufacturer (e.g., Volvo), which imparts upon customers the goodwill and value in the brand name.  Fidelity also sells non-branded products -- that is, products with Fidelity's name.

As noted, the dealers are two Massachusetts-based Volvo dealerships that sell Volvos and Volvo products.

### 2.    The Parties' Contractual Relationships

Several contracts govern the parties' various relationships.  Volvo USA and each of the dealers are parties to identical Volvo Retailer Agreements.  The Retailer Agreements set forth the basic terms of the Volvo franchise and the dealers' various obligations to customers and to Volvo USA.  The Retailer Agreements contain no express terms that reference the Volvo PPM.

Volvo Financial and Fidelity are parties to a Master Services Agreement that governs Fidelity's development and administration of several financing and insurance products, including the Volvo PPM, which Volvo dealerships may sell to their customers.  Under the Master Services Agreement's terms, Fidelity must offer Volvo dealers the option to enter into "Administrative Agreements" which allow dealers to sell their customers various Fidelity-designed financial product contracts.  These products include both Volvo-branded and non-branded PPMs, but also other contracts such as "Volvo Service," "Volvo Ding Shield," and "Theft

- 4 -

Deterrence." When a dealer sells a product under the Administrative Agreement, Fidelity pays Volvo Financial certain referral and incentive fees.

The dealers together executed an Administrative Agreement with Fidelity. Under its terms, Fidelity agrees to administer and offer to dealers its suite of financial and insurance products, including the Volvo PPM, that dealers in turn may sell to their customers. In exchange, the dealers pay a fee to Fidelity for each contract sold, according to a pre-set fee schedule. The Administrative Agreement contains an integration clause providing that it comprises "the full and entire understanding and agreement" between Fidelity and the dealers and does not incorporate the Retailer Agreements or the Master Services Agreement by reference. The initial term of the Administrative Agreement was for one year, beginning on June 1, 2018. After that term, the agreement was terminable at any time by any party with thirty days' written notice. No party has exercised their right to terminate the agreement.

### 3. The Volvo PPM

One such financial product that Fidelity offers is the Volvo-branded PPM, which allows consumers to pre-pay for certain car maintenance services. Generally, the dealers provide repair and maintenance services that fall into two buckets. The first bucket concerns services related to the manufacturing and

essential functioning of a car, such as repairing a malfunctioning engine, differential, or transfer case. The second bucket comprises more routine and periodic maintenance services, such as oil changes, tire rotations, and fluid adjustments. For new Volvos, a three-year, standard-issue warranty covers the cost of services that fall in either bucket. After the three-year warranty period expires, a consumer can extend coverage for services under the first bucket with a service contract. To extend coverage for services in the second bucket, a consumer can buy a PPM.

On the consumer-facing side, the Volvo PPM allows consumers to "lock in" discount prepaid rates for bundles of anticipated routine maintenance tasks like oil changes and fluid replacements in the post-warranty period. This means that even after the initial three-year warranty expires, consumers who purchase a Volvo PPM contract can take their Volvo to their Volvo dealer for routine maintenance services that are covered under their given PPM contract for no additional cost. The dealer selling the PPM contract has complete control over the PPM contract sale price, although Fidelity provides dealers recommended sale prices to charge.

On the dealer-facing side, the Volvo PPM requires Fidelity to reimburse the dealers a portion of their parts and labor costs incurred to service PPM contracts according to pre-set "Maintenance Services Reimbursement Tiers." Each "tier"

effectively supplies a menu of reimbursement amounts for a given bundle of PPM services. For example, as of August 2017, "Tier 36" entitled dealers to $105 in reimbursements for changing a set of wiper blades and $253 for changing front brake pads; "Tier 38" entitled dealers to $108 and $271 in reimbursements for those respective services; and "Tier 42," $120 and $343, respectively. The higher the tier, the higher the reimbursement amounts to dealers -- but also higher the fee that dealers must pay Fidelity for each contract sold. Dealers choose the reimbursement tiers they think are best tailored to their business needs and costs when they sign the Administrative Agreement, although they can also change their tiers later if needed.

Volvo USA advertises that the Volvo PPM will be "honored at any authorized Volvo dealership." The amount that Fidelity reimburses a PPM-servicing dealer depends, however, on the reimbursement tier selected by the dealer that sold a given PPM contract, not the reimbursement tier selected by the dealer servicing that PPM contract. This can result in a dealer being reimbursed at a lower rate than provided for in the dealer's contract with Fidelity. For example, if a customer buys a Volvo PPM contract from Dealer A, who is at Tier 39, then redeems that same PPM contract with Dealer B, who is at Tier 41, Fidelity reimburses Dealer B at Tier 39 rates even though Dealer B prices and sells its own Volvo PPM contracts at higher prices based on

its more profitable Tier 41 reimbursement rates. A similar problem arises if a customer takes a Volvo PPM contract to one of the nineteen Volvo dealers, nationwide, who do not offer the Volvo PPM.

## B.    Procedural Background

In the operative complaint, the dealers assert six claims under various provisions of Chapter 93B, commonly known as the "Dealers' Bill of Rights." See Cadillac/Oldsmobile/Nissan Ctr., Inc. v. Gen. Motors Corp., 391 F.3d 304, 306 (1st Cir. 2004); Mass. State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc., 15 N.E.3d 1152, 1155-56 (Mass. 2014). Altogether, the claims allege that the defendants-appellees are unlawfully underpaying the dealers for the parts and labor they expend to service the Volvo PPM.

The parties cross-moved for summary judgment on Counts I, II, III, V, and VI, which assert violations of Chapter 93B Sections 9(b)(1), 9(b)(2)(vii), and 4(c)(12).[2] After oral argument, the district court issued a text order granting the defendants-appellees' motion and denying the dealers' motion.

This appeal followed.

---

[2] Count IV alleges a violation of Section 4(c)(9). Only defendants-appellees moved, successfully, for summary judgment on this claim, and the dealers do not raise it on appeal. Accordingly, we do not address it here.

## II. Standard of Review

We review a district court's grant or denial of summary judgment de novo. Mullane v. United States Dep't of Just., 113 F.4th 123, 130 (1st Cir. 2024) (citing Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56 (1st Cir. 2021)). This remains true even when considering cross-motions for summary judgment. Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 852 F.3d 105, 110 (1st Cir. 2017) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996)). Summary judgment is appropriate "when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law." Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023) (quoting Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009)).

"[I]n appraising summary judgments, as in other matters, a court of appeals is not wedded to the district court's reasoning. Rather, '[w]e are free, on appeal, to affirm a judgment on any independently sufficient ground.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48-49 (1st Cir. 1990) (second alteration in original) (quoting Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir. 1987)).

## III. Discussion

The dealers raise two main arguments on appeal. First, they challenge the level of detail in the district court's order resolving the cross-motions for summary judgment. Second, they

challenge the direct merits of the district court's ruling. We address each in turn.

### A. Sufficiency of District Court's Order

The dealers first contend that the district court erred by disposing of the parties' cross-motions for summary judgment too summarily. We disagree.

The district court did not issue a separate written opinion setting forth its full analysis of the parties' motions and arguments. Rather, it resolved them with the following three-sentence text order entered into the docket:

> After hearing and upon consideration of the parties' respective submissions, the defendants' motion for summary judgment is GRANTED as to all counts asserted in the plaintiffs' amended complaint, substantially for the reasons advanced by the defendants. The plaintiffs' cross-motion for summary judgment on counts I, II, III, V, and VI is correspondingly DENIED. The parties involved in making available to Volvo owners post-warranty maintenance and repair financing cannot plausibly be understood to be "manufacturers" or "distributors" of motor vehicles as those terms are used in Chapter 93B of the Massachusetts General Laws.

The dealers argue that this "deficient" discussion fails to properly identify the grounds on which the district court reached its decision. We disagree. The district court's order satisfies the minimal requirements set forth by the Federal Rules of Civil Procedure. Under Rule 56, a district court is simply required to "state on the record the reasons for granting or

denying the [summary judgment] motion." Fed. R. Civ. P. 56(a). The first and last sentences of the order do just that. And while the dealers also argue that the order fails to reconcile the competing factual and legal arguments the parties raised, the district court was not required to do so. See Fed. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule . . . 56 . . . ."); see also Grossman v. Berman, 241 F.3d 65, 68 (1st Cir. 2001) ("[A] trial court, on a motion for summary judgment, has no absolute obligation either to make specific findings of fact or to elaborate upon its view of the controlling legal principles.").

Even the dealers concede that "the Order on its face is not necessarily deficient" and that it "meet[s] the letter of the Federal Rules . . . ." That is enough.[3] Accordingly, we will not remand or reverse based on the brevity of the district court's order.

---

[3] While text orders are not prohibited, we nonetheless encourage district courts to elaborate more fully the reasons for ruling upon a dispositive motion, even if in brief form. See United States v. Zhong H. Chen, 815 F.3d 72, 82 (1st Cir. 2016) ("[D]istrict courts 'should take reasonable steps to ensure that the parties and the appellate courts will be able to glimpse the foundation on which their rulings rest,' [since] in some cases, 'such statements are a necessary precondition to intelligent appellate review.'" (quoting Grossman, 241 F.3d at 68)).

## B.    Chapter 93B

We now turn to the core issue of the case: whether defendants-appellees violate Chapter 93B because the reimbursement rates that Fidelity pays the dealers for servicing the Volvo PPM are below what the statute requires.

Chapter 93B's relevant provision provides:

> A manufacturer or distributor shall within a reasonable time fulfill its obligations under all express warranty agreements made by it with respect to a product manufactured, distributed or sold by it and shall adequately and fairly compensate any motor vehicle dealer who, under its franchise obligations, furnishes labor, parts and materials under the warranty or maintenance plan, extended warranty, certified preowned warranty or a service contract, issued by the manufacturer or distributor or its common entity, unless issued by a common entity that is not a manufacturer . . . .

Mass. Gen. Laws ch. 93B, § 9(b)(1).[4]  The statute benchmarks "fair and adequate compensation" to retail rates and prices that dealers customarily charge.  Id. §§ 9(b)(1), (2)(i)-(ii).

---

[4] The dealers also assert claims under two other provisions. Those provide in relevant part:

> A manufacturer or distributor shall not implement or continue a policy, procedure or program to any of its dealers in the commonwealth for compensation which is inconsistent with this subsection.

Mass Gen. Laws ch. 93B § 9(b)(2)(vii).

As a threshold matter, we must decide whether Chapter 93B regulates the Volvo PPM at all.  By its express language, Chapter 93B guarantees dealers "adequate[] and fair[]" compensation for "labor, parts, and materials" furnished only if dealers are required to do so under their "franchise obligations."  Id. § 9(b)(1).  We thus examine whether the dealers sell and service the Volvo PPM under their "franchise obligations."  For the following reasons, we conclude that they do not, and thus Chapter 93B does not require Fidelity to reimburse dealers under the Volvo PPM at the rates set by statute.

### 1.   Definition of "Franchise Obligation"

Chapter 93B defines "franchise" as:

> [A]n oral or written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a motor vehicle dealer a license to use a trade name,

---

> It shall be deemed a violation of [Chapter 93B] for a manufacturer, distributor or franchisor representative . . . to act to accomplish, either directly or indirectly through any parent company, subsidiary, or agent, what would otherwise be prohibited under this chapter on the part of the manufacturer or distributor.

Id. § 4(c)(12).  The dealers argue that both provisions prohibit Volvo USA from skirting around Section 9(b)(1) via an "attenuated arrangement" to administer the Volvo PPM through Volvo Financial and Fidelity.  However, as we discuss below, we consider the gating question of whether selling and servicing the Volvo PPM is a franchise obligation at all, regardless of who administers it.  Because we conclude no, we do not address the dealers' arguments asserted under these provisions.

> service mark, or related characteristic, and in which there is a community of interest in the marketing of new motor vehicles or services related thereto at wholesale, retail, leasing, or otherwise.

Id. § 1. Chapter 93B does not define "obligation." The parties do not provide any authority interpreting the meaning of "obligation" as used in Section 9(b)(1), nor can we find any. And so, we look to the plain meaning of "obligation": "[a] legal or moral duty to do or not do something." Obligation, Black's Law Dictionary (12th ed. 2024). Putting the two definitions together, "franchise obligations" therefore refers to duties to do or not do certain things under an "arrangement" to market new Volvos or services related to them.

We thus turn to the Retailer Agreement between the dealers and Volvo USA to determine what franchise obligations, if any, the dealers carry with respect to the Volvo PPM. The dealers contend that it is a franchise obligation to both sell and service the Volvo PPM. We disagree on both counts.

### 2. Selling the Volvo PPM

The Retailer Agreement requires dealers to sell "Volvo Accessories," among other things. The dealers contend that "Volvo Accessory" is a term that encompasses the Volvo PPM and that they are therefore bound by the Retailer Agreement to sell them. We disagree.

First, the Retailer Agreement defines Volvo Accessory as "[a]n accessory supplied by [Volvo USA] or by a Volvo Affiliate." This itself is not a model of clarity, but the term's use in context is instructive.  "Volvo Accessory" and "accessory" appear in provisions that:

- Require dealers to sell and "maintain sufficient inventory of . . . Volvo Accessories to meet customer demand and your sales objectives" (emphasis added);

- Prohibit dealers from "sell[ing] parts (including software) or accessories that infringe [Volvo USA's] intellectual property rights" (emphasis added); and

- Require Volvo USA to "invoice [dealers] for the full price of the following Volvo Products on the following date: . . . for each Genuine Volvo Part or Volvo Accessory ordered by you, the date when it is shipped from our distribution center" (emphasis added).

From this context, we cannot reasonably conclude that "Volvo Accessory" includes something like the Volvo PPM -- a financial contract that is intangible, not quantified with respect to an inventory, and incapable of possessing attributes like a ship date from a distribution center.  This reading of "accessory" also accords with its plain meaning: "an object or device that is not essential in itself but adds to the beauty, convenience, or

- 15 -

effectiveness of something else." Accessory, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphases added).

Second, neither party disputes that at least nineteen Volvo dealers, out of 281 total authorized Volvo dealerships nationwide, do not sell the Volvo PPM. They do not do so despite the Retailer Agreement incorporating "standard provisions" written by Volvo USA which the dealers contend are identical for all Volvo dealers nationwide. It then follows that these nineteen dealers either are in breach of their franchise obligations under the Retailer Agreement, or the Retailer Agreement does not obligate dealers to sell the Volvo PPM. Neither side asserts, or offers any evidence supporting, the first contention.

Third, the Volvo PPM is far from the only finance and insurance product listed in the Administrative Agreement between the dealers and Fidelity. And the dealers' designated corporate representative, Joseph Laham, testified at deposition that it is within the dealers' discretion whether to sell these other, non-PPM finance and insurance products offered by Fidelity and, in turn, that dealers affirmatively choose not to sell certain such products. Yet the dealers fail to explain how these non-PPM products differ meaningfully from the Volvo PPM such that one is a Volvo Accessory, but the others are not. In other words, the dealers impliedly concede that they have discretion to sell an

- 16 -

entire category of finance and insurance products -- a category that includes the Volvo PPM.

The dealers also make a more general argument that Volvo USA and Volvo Financial consistently pressure dealers to sell the Volvo PPM, essentially rendering the sale of the Volvo PPM obligatory. In support, they point to (1) Volvo USA's advertisements which categorically state, without firm contractual basis, that "Prepaid Maintenance will be honored at any authorized Volvo dealership"; (2) a provision in the Master Services Agreement between Fidelity and Volvo Financial that requires Fidelity to notify Volvo Financial of the names of any dealers who decline to sell Volvo-branded contracts, after which Volvo Financial may contact those dealers to "discuss" that decision; and (3) mandatory monthly meetings between Volvo USA and Volvo Financial managers and Volvo dealers, including the dealers here, where they review and discuss "penetration reports" generated by Fidelity on the regional sales of the Volvo PPM and other finance and insurance products.

These facts, however, do not by themselves create a franchise obligation under the Retailer Agreement. Rather, these facts clarify what is already apparent from the thicket of contractual relationships at issue in this case: Volvo has a vested interest in its dealers selling as many Volvo PPM contracts as possible, evidenced, in part, by the referral and incentive

fees that trickle up to Volvo Financial with every Volvo PPM contract sold. While the dealers may feel acute commercial pressure from Volvo USA to sell the Volvo PPM, that alone does not mean they have any contractual obligation to do so.

### 3. Servicing the Volvo PPM

The dealers also argue that it is a franchise obligation to accept and service the Volvo PPM no matter which dealer originally sold a given PPM contract. In support, they identify contract provisions that:

- Permit Volvo USA to terminate the Retailer Agreement if a dealer breaches a separate agreement with a Volvo Affiliate; and

- Require the dealers to "give the highest priority to resolving customer complaints and questions and addressing any shortcomings in [dealers'] operations highlighted in customer feedback" and relatedly, permit Volvo USA to set "reasonable business objectives for [dealers'] sales of Volvo Products and how satisfied [dealers'] customers are" and provide for sanctions if the objectives are not met.

We address each provision in turn.

The dealers argue that the first provision forces them into a position of either accepting all Volvo PPM contracts they encounter, or breaching their Administrative Agreement with

- 18 -

Fidelity. Assuming, without deciding, that Fidelity is a Volvo Affiliate as defined in the Retailer Agreement, the dealers fail to show how refusing to service a given Volvo PPM contract purchased from a different dealer results in a breach of their own Administrative Agreement with Fidelity. To recap, the Administrative Agreement is between the dealers and Fidelity. The dealers are not in contractual privity with other dealers, and the Administrative Agreement contains no express provisions requiring the dealers to honor PPM contracts sold by other dealers. Even assuming otherwise, if the dealers no longer wish to service the Volvo PPM, they are free to unilaterally terminate their agreement with Fidelity at any time after the initial one-year period (which has long since passed) with thirty days' written notice.[5]

As for the second provision, it is true that customers, unhappy with the dealers for declining to service Volvo PPM contracts purchased from other dealers, could leave the dealers bad reviews, which would interfere with the dealers' contractual obligation to have satisfied customers. However, the possibility of spurned PPM-holders leaving bad reviews and in turn causing a breach of the Retailer Agreement is too attenuated a scenario to

_____

[5] Bolstering this point is Laham's deposition testimony that, once he complained to Fidelity about the divergence between who chooses the reimbursement tier and who gets paid the reimbursement tier for a given Volvo PPM contract, Fidelity told him to stop selling and honoring the Volvo PPM.

support the conclusion that servicing the Volvo PPM is a franchise obligation.

For one, "bad reviews from unhappy customers" is not included in the list of circumstances permitting the termination of the franchise agreement. Rather, the Retailer Agreement's termination protocol provides for a franchise's immediate termination in serious circumstances such as a dealer's insolvency, violation of antitrust laws, or providing materially false statements to Volvo USA. Otherwise, the protocol enumerates other, less egregious circumstances that will begin an extended, ninety-day termination process, which includes a sixty-day "correction period." The last enumerated circumstance is a catch-all term covering the "breach [of] any other material term of this agreement." The Retailer Agreement then lists nine specific sections that are "material," which include sections on the location of the dealership, what the dealership will sell, the dealership's business plan, and Volvo's code of conduct. Absent from that list of sections is the section requiring dealers to have satisfied customers and "give the highest priority to resolving customer complaints." Given this context, we cannot see how the customer satisfaction provision would be considered material, especially as the dealers have pointed to nothing suggesting that the customer satisfaction provision constitutes a material term of the Retailer Agreement.

In sum, Section 9(b)(1) supplies a viable claim only if servicing the Volvo PPM is a "franchise obligation[]." Mass. Gen. Laws ch. 93B § 9(b)(1). The dealers may be motivated to service the Volvo PPM to avoid possible negative customer reviews in order to ensure perfect performance under the contract, but that does not show that servicing the Volvo PPM is required by the Retailer Agreement. The dealers therefore have failed to show that servicing the Volvo PPM is part of their franchise obligations.

## IV.  Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants-appellees.